**APPLE COMPUTER, INC., a California corporation, Plaintiff,**

v.

**MICROSOFT CORPORATION, a Delaware corporation, and Hewlett Packard Company, a California corporation, Defendants.**

No. C–88–20149–VRW.

United States District Court,
N.D. California.

March 6, 1991.

Chris R. Ottenweller, Brown & Bain, Palo Alto, Cal., Jack E. Brown, Brown & Bain, Phoenix, Ariz., for plaintiff Apple Computer, Inc.

David T. McDonald, Karl J. Quackenbush, McDonald & Quackenbush, William O. Ferron, Jr., Seed & Berry, Seattle, Wash., John N. Hauser, Lynn H. Pasahow, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., David H. Binney, Robert W. Gomulkiewicz, Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, Wash., for defendant Microsoft Corp.

Jon Stark, Pennie & Edmonds, New York City, Neil Boorstyn, McCutchen, Doyle,

Brown & Enersen, San Francisco, Cal., for defendant Hewlett–Packard Co.

## ORDER ON CROSS MOTIONS FOR SUMMARY ADJUDICATION

WALKER, District Judge.

Apple Computer, Inc. ("Apple") filed this copyright infringement action on March 17, 1988, against Microsoft Corporation ("Microsoft") and Hewlett–Packard Company ("HP"), claiming that Microsoft's Windows computer operating system software and HP's NewWave computer application software infringed Apple's copyrights. The copyrights at issue protect the visual displays of Apple's Macintosh computer user interface.

## I. *THE VISUAL DISPLAYS OF THE MACINTOSH INTERFACE.*

In developing the Macintosh computer operating system software, Apple made one of the major commercial breakthroughs of the 1980's. The graphic user interface generated by the Macintosh system software consists of windows, icons, pull-down menus, and other images or visual displays projected on the computer screen. The Macintosh user interface[1] proved so intuitive that users were able fairly quickly to learn how to manipulate the screen displays and mouse and thus accomplish what had theretofore been the daunting task of learning to operate a computer. This breakthrough vaulted Apple to the top of the personal computer industry.

The visual displays in a computer user interface owe their appearance to system software and application programs. System software is a computer program that controls the computer hardware and schedules the execution of its functions. Such software is keyed to the computer hardware which it runs and establishes the visual framework or environment for the images on the computer screen, as does a proscenium in a theatre. In order to put a computer to a specific task, however, the user also needs an application program—to further the stage analogy, the play. Application programs must be keyed to a particular system software and work within that system's framework or environment to carry out a specific application or task, e.g., word processing, accounting, and charting.

The obvious difference between a stage play and a computer interface is that in the latter, the user directs the action. The "user friendliness" of the Macintosh interface gave Apple a competitive edge over other personal computer manufacturers.

The commercial success of the Macintosh user interface and competition produced by Microsoft's analogous Windows Version 1.0 system software for IBM and IBM-compatible personal computers spawned a dispute between Apple and Microsoft over the rightful ownership of visual displays in this interface. The parties' dispute extended to ownership of visual displays in Microsoft Windows Version 1.0, and certain application programs: Microsoft Multiplan and Microsoft Excel, both spread-sheet programs; Microsoft Chart, a graphics program; Microsoft File, a database program; and Microsoft Word, a word processing program.[2] On November 22, 1985, Apple and Microsoft entered into an agreement ("1985 Agreement") to settle this dispute. The effect of that agreement upon the parties' rights was the first matter which the Honorable William W Schwarzer, to whom this case was previously assigned, sought to determine.

The 1985 Agreement provided that: (1) Microsoft acknowledged that the visual displays in the Microsoft Windows Version 1.0 operating system and the disputed application programs were derivative works of the visual displays generated by Apple's Macintosh operating system and that of an earlier Apple effort, the Lisa; (2) Apple granted to Microsoft a non-exclusive, royalty-free, nontransferable license to use these derivative visual displays in present and future software programs and to license them to

---

**1.** This case deals only with the graphic elements or visual displays of the Macintosh user interface. The whole Macintosh user interface includes both its graphic elements or visual displays and the mouse technology which enables the user to point on these graphic elements and command some computer operation.

**2.** Microsoft developed Multiplan, Chart and File under an earlier agreement with Apple.

third parties for use in new software programs; (3) Microsoft agreed not to offer a new application program similar in function to Microsoft Excel prior to October 1, 1986; (4) Apple waived any copyright, patent, trade secret or other claim it may have as to Windows Version 1.0; (5) Microsoft granted to Apple a non-exclusive, royalty-free, nontransferable license to use any new visual displays created by Microsoft during the next five years as part of the Microsoft Windows retail software products; and (6) Microsoft agreed to revise Microsoft Word, which operates on the Macintosh operating system, by enhancing and improving that program by July 31, 1986.

Relying on this agreement, Microsoft apparently granted HP a license to use the Microsoft Windows system software in the development of what came to be known as HP's NewWave application program. Sewell Declaration with Appendix in Support of Apple's Summary Judgment Motion, Exh. 39. After learning of the HP New-Wave application program and evidently fearing that Microsoft's licensing activities would soon diminish the Macintosh competitive advantage, Apple filed this lawsuit.

Apple's complaint alleged three claims: (1) copyright infringement of Apple's audiovisual works by HP's NewWave and Microsoft's Windows Version 2.03; (2) contributory infringement against Microsoft for licensing Apple's visual displays to HP; and (3) unfair competition. Microsoft and HP asserted a variety of affirmative defenses, including two addressed in this order: Apple's allegedly fraudulent procurement of its copyrights and the asserted lack of originality of the Macintosh graphic user interface.

By orders dated March 20 and July 25, 1989,[3] Judge Schwarzer summarily adjudicated that: (1) the 1985 Agreement was not a complete defense to Apple's claim of copyright infringement; (2) the 1985 Agreement granted Microsoft a license to use in current and future software products the visual displays in Windows Version 1.0 and the five named Microsoft application programs; and (3) the visual displays in Windows 2.03 are in Windows 1.0 and the named application programs except for those relating to the use of overlapping main application windows and to certain changes in the appearance and manipulation of icons. Judge Schwarzer granted Microsoft partial summary judgment on Apple's infringement claim to the extent that Windows 2.03 and NewWave used visual displays that had appeared in Windows Version 1.0 and the five application programs named in the 1985 Agreement. 717 F.Supp. at 1435. Such visual displays were protected from Apple's infringement claims by virtue of the 1985 Agreement's licensing provisions. In reaching this conclusion, Judge Schwarzer rejected Apple's contention that the 1985 Agreement forbade Microsoft from developing in later system software an overall visual appearance more similar to that of the Macintosh than Windows Version 1.0. 717 F.Supp. at 1431. Judge Schwarzer determined that the 1985 Agreement licensed only those visual displays in Windows Version 1.0 and the five application programs named therein. 717 F.Supp. at 1435.

Judge Schwarzer's approach entailed analysis of the works' discrete "visual displays."[4] Pursuant to Judge Schwarzer's direction, Apple identified 189 Macintosh visual displays which it claimed appear in Windows Version 2.03 and NewWave.[5] Judge Schwarzer reorganized these visual displays into six categories and decided that with respect to Windows Version 2.03, all visual displays except the use of overlapping application windows and certain changes in the appearance and manipulation of icons were protected from Apple's infringement claims by virtue of the 1985

---

**3.** *Apple Computer, Inc. v. Microsoft Corp.,* 709 F.Supp. 925, 717 F.Supp. 1428 (N.D.Cal.1989).

**4.** The term "visual displays" comes from the 1985 Agreement. *See* Appendix to Microsoft's

Memorandum in Support of Motion for Partial Summary Judgement, Exh. K.

**5.** Apple's document entitled "Similarities between Apple's Copyrighted Audiovisual Works and Microsoft's Windows 2.03 and Hewlett–

Agreement.[6]  717 F.Supp. at 1433–35.

By an order to which the parties stipulated during Judge Schwarzer's supervision of the litigation, this court limited the current phase of litigation to issues regarding the validity and scope of Apple's copyrights in the works in suit and whether any of the ten remaining visual displays are licensed under the 1985 Agreement between Apple and Microsoft.

Presently before the court are: (1) Microsoft's motion for partial summary judgment, seeking a determination that seven of the ten remaining visual displays from Apple's List are licensed by the 1985 Agreement, and that none of the remaining ten features is protectible expression within the scope of any of Apple's copyrights; (2) HP's motion seeking partial summary adjudication that: (a) each of the 50 remaining items[7] on Apple's list of similarities applicable to NewWave is not original; (b) each of the remaining items does not constitute protectible expression under copyright law; or (c) the scope of protection for such items is so narrow that only virtually identical copying can constitute infringement; and (d) 11 of the remaining 50 items are licensed visual displays under the 1985 Agreement and are protected against Apple's claim of copyright infringement; and (3) Apple's motion for partial summary adjudication that Apple's audiovisual copyrights are valid and the Microsoft and HP affirmative defenses should be dismissed.

■ Implicit in Judge Schwarzer's approach to the case is a rejection of Apple's fundamental contention that the "total concept and feel" of the Macintosh graphic user interface is protectible expression. Rather, Judge Schwarzer's approach appears to have been to exclude licensed visual displays prior to applying the substantial similarity of idea and expression tests. The undersigned has considered a different approach to the litigation from that adopted by Judge Schwarzer, one that would not begin by an attempt to parse the visual displays of the Macintosh system software. However appealing such an approach might seem in the abstract, the 1985 Agreement appears to license individual visual displays rather than an overall "total concept and feel."[8]  After lengthy consideration, the undersigned has concluded that Judge Schwarzer correctly began his analysis of the issues in the litigation with the 1985 Agreement. The court thus turns to the motions directed to the remaining issues involving the 1985 Agreement.

## II. *MICROSOFT'S MOTION FOR PARTIAL SUMMARY JUDGMENT.*

In his July 25, 1989 order,[9] Judge Schwarzer found that particular changes in the appearance and use of icons, namely, the storage of icons anywhere on the screen rather than just at the bottom of the screen, the display of the icon's name below the icon, and changes in visual displays necessary to implement the overlapping windows system, were not licensed under the 1985 Agreement.  717 F.Supp. at 1433–1435.  The remaining visual displays are:

A1  overlapping windows in front of a muted background;

A8  windows appearing partly on and off screen;

B1  top overlapping window displayed as the active window;

B2  window brought to top of stack when mouse clicked;

Packard's NewWave" shall hereinafter be referred to as "Apple's List."

**6.** This holding did not affect the visual displays which Apple claimed are found only in NewWave.  717 F.Supp. at 1433 n. 8.

**7.** Although HP correctly states that there are fifty visual displays on Apple's List which pertain only to NewWave, there are additional visual displays on Apple's List which refer to both NewWave and Windows 2.03.

**8.** An evaluation of whether the "total concept and feel" of the works is substantially similar should occur after unprotectible elements of expression have been identified and excluded from consideration.  *See Data East USA, Inc. v. Epyx, Inc.,* 862 F.2d 204, 208 (9th Cir.1988).

**9.** *Apple Computer, Inc. v. Microsoft Corp.,* 717 F.Supp. 1428 (N.D.Cal.1989).

D1 gray outline of window dragged along with cursor when mouse pressed on window's title bar;

D2 window dragged to a new position when the mouse is released after dragging the window's outline;

D3 newly exposed areas on screen are redisplayed after the window is moved;

G4 icon may be moved to any part of screen by dragging along with cursor when user presses mouse on icon;

G5 display of icons on screen behind any open windows;

G6 icon's title displayed beneath icon; and

■ In support of its contention that seven of the ten remaining visual displays (A1, A8, B1, B2, D1, D2, D3) are licensed, Microsoft has submitted a videotape, Exhibit H, which shows that each of the seven visual displays appeared in the 1985 version of Microsoft Excel. Microsoft argues that any visual displays in Windows Version 1.0 and the five application programs developed by Microsoft (Word, Chart, File, Excel, and Multiplan) are licensed under the 1985 Agreement and, hence, are protected from Apple's claims of copyright infringement.

Apple contends that each of the Microsoft application programs developed for the Macintosh computer owes its distinctive Macintosh-like appearance to the Macintosh system software without which the application programs could not run. The visual displays which appear on the screen when an application program is running on a Macintosh computer are generated by the interaction between the Macintosh system software and the application program. Therefore, contends Apple, the only visual displays in the five named application programs which are licensed under the 1985 Agreement are those which are created by the code of the Microsoft application programs, not those generated by application calls to the Macintosh system software. The visual displays which are generated by the Macintosh system software include the window frames, moving animation, and the redisplay of those portions of the screen

exposed by a window which has been moved. The visual displays which are generated by the Microsoft Excel application program are the contents of the windows. Capps Supp. Decl. ¶¶ 3, 4 and Exh. 1.

The issue of which visual displays are generated by the Microsoft application programs and which by the Macintosh system software was raised earlier before Judge Schwarzer, in a slightly different context. In his March 20, 1989 Order, Judge Schwarzer declined to consider whether the visual displays in issue were generated by the Microsoft application programs or by the Macintosh system software. The point arose in connection with Microsoft's argument that the 1985 Agreement licensed to Microsoft all visual displays that could possibly be called up by running the five Microsoft application programs on the Macintosh system software then or in the future. 709 F.Supp. at 929. Judge Schwarzer concluded that Microsoft's contention would "defy common sense." *Id.*

Microsoft refers to the depositions of Albert Eisenstat, Apple's Senior Vice President, and John Sculley, Apple's President and CEO, in which these negotiators of the 1985 Agreement did not remember discussing the distinction between visual displays generated by the Microsoft application software code and those generated by the Macintosh system software code. Appendix to Microsoft's Reply to Apple's Response to Microsoft's Motion for Partial Summary Judgment. Furthermore, Microsoft contends that it would have been extremely difficult for the negotiators of the 1985 Agreement to determine which visual displays were attributable to which program codes because such information would require a detailed analysis of the images created by each software program.

Apple contends that: (1) the controversy which resulted in the 1985 license related entirely to Microsoft Windows Version 1.0; (2) Apple did not present any complaint formally or informally regarding any of the Microsoft application programs; and (3) Microsoft's Chairman Gates repeatedly explained that he sought confirmation of Microsoft's ownership of the visual displays

in only those application programs that Microsoft created and owned. Apple's Response to Defendants' Motions for Partial Summary Judgment at 10.

Under California law, ambiguities in a written agreement are to be interpreted against the drafter, in this case, Microsoft. *See S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir.1989) (citing *Heston v. Farmers Ins. Group*, 160 Cal.App.3d 402, 415, 206 Cal.Rptr. 585 (1984)); *Interpetrol Bermuda Ltd. v. Kaiser Aluminum Int'l Corp.*, 719 F.2d 992, 998 (9th Cir.1983).

Moreover, the Ninth Circuit has directed district courts to interpret copyright licenses narrowly, consistent with the federal copyright policy of providing incentives in the form of copyright protection to authors. *See S.O.S. Payday*, 886 F.2d at 1088 ("copyright licenses are assumed to prohibit any use not authorized"); *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 854 (9th Cir.1988). In *S.O.S. v. Payday*, the court concluded that a software developer's grant of a "right of use" of several software programs to a company which provided financial services to clients did not confer the right to copy and prepare a modified version of the software programs without the licensor's permission. The court concluded that the licensee had only acquired the right to possess copies of the software programs for purposes of producing a product for its clients, and, therefore, had exceeded the scope of its license. Similarly, the *Cohen* court construed a license of a copyrighted work narrowly. *Cohen* involved a license to record and copy a motion picture and exhibit it "by means of television," which was construed not to include the distribution of videocassettes for home viewing, VCRs for home use not having been invented at the time the license was executed.

In light of these rules of construction and the 1985 Agreement's purpose to resolve the dispute over ownership of visual displays in Windows Version 1.0, the court concludes that the 1985 Agreement did not license the visual displays which are generated by calls from the Microsoft application programs to the Macintosh operating system. The mere fact that the Macintosh system software was designed so that the Macintosh interface could be used in conjunction with a variety of application programs written for the Macintosh computer,[10] should not open the door to a construction at odds with usual principles of contract law and the agreement's evident purpose. It would be astonishing if Apple had licensed those visual displays which had won for it great acclaim for aesthetic and intuitive appeal.

What Microsoft received in the 1985 Agreement was the right to continue to market its application programs written for the Macintosh and to use the visual displays generated by those application programs (not the visual displays generated by calls by the application programs to the Macintosh operating system) in present and future programs.

Although seven of the ten remaining visual displays from Apple's List (A1, A8, B1, B2, D1, D2, and D3) do appear on the screen when the Microsoft Excel application program runs in conjunction with the Macintosh operating system, each of those seven visual displays owes its appearance to the Macintosh operating system. Capps Supp. Declaration. Therefore, those seven visual displays are not licensed under the 1985 Agreement. Microsoft's motion for summary adjudication that these displays are covered by virtue of being in the 1985 version of Microsoft Excel is, therefore, denied.

### III. *HP'S MOTION FOR PARTIAL SUMMARY JUDGMENT.*

As to the scope of the 1985 Agreement, HP contends that eleven of the fifty visual displays in Apple's List are covered by the 1985 Agreement and, therefore, are protected from Apple's claims of copyright infringement. These visual displays are: I3, I5, I10, I11, I12, F18, F19, G10, G19, G20, and G22.

---

**10.** By permitting application programs to call upon the Macintosh system software to generate visual displays, the Apple software developers simplified the task of writing application programs for the Macintosh computer.

█ A determination of the legal significance of undisputed historical facts, such as the visual displays in Windows Version 1.0 and NewWave, involves a mixed question of fact and law normally decided by the court and, therefore, appropriate for summary judgment. *See Cohen,* 845 F.2d at 853, 855 (reversal of summary judgment in favor of licensee).

█ As a preliminary matter, HP's motion for summary adjudication rests on the assumptions that the 1985 Agreement granted Microsoft the right to use and license to third parties visual displays in Windows Version 1.0 and that HP is entitled to use those visual displays by virtue of a license from Microsoft to HP. The first assumption is plainly justified by Section 2A of the 1985 Agreement. Strangely, the second assumption is questionable. HP has not established the terms of the Microsoft–HP license. Absent such an agreement, HP has no right to rely on the 1985 Agreement between Microsoft and Apple as a defense to copyright infringement. Because the parties proceeded with two summary judgment motions without clarifying this issue and there are letters referring to a license between Microsoft and HP,[11] the court can only assume that Microsoft did license the use of visual displays in Windows Version 1.0 to HP. The court is confident that the lawyers for these parties will be heard from if this is not the case and shall thus address the merits of HP'S motion.

After reviewing the videotape exhibits submitted on this issue and comparing the appearance of these eleven visual displays in Apple's programs and in Microsoft Windows Version 1.0, the court drew the following conclusions.

Items I3, I5, I12, F18, F19, and G22 on Apple's List are all present in Windows Version 1.0 and hence are *covered by the 1985 License.*

█ Item I10 is licensed insofar as Windows Version 1.0 contains a "Select All" item in the Edit pull-down menu which allows the user to select all text in the window and display that text in reverse video. To the extent that the Windows Version 1.0 "Select All" item does not permit selection by reverse video of any icons, the "Select All" item is not licensed.

█ Item I11, a menu called "View" which presents the user with a number of menu items allowing the user to choose the folder's window display as icons or as a tabular list by name, type, or modification date, is licensed except insofar as Windows Version 1.0's "View" pull-down menu does not offer the user the option to display a folder's contents as icons in the window.

█ Item G19, selection of an icon by changing both the icon and its name into reverse video, is not licensed because in Windows Version 1.0 only disk drive icons and their names, which are not aligned directly below, can be selected by reverse video. The appearance of selecting only disk drive icons by reverse video in Windows Version 1.0 is significantly different from the selection of the variety of icons in the Macintosh and NewWave programs.

█ Items G10 and G20 do not appear to be licensed, but the association of different icon images with different types of objects and the use of a mouse to move icons around on a screen appear to be ideas. For purposes of the current motion, the court finds only that items G10 and G20 are not covered by the 1985 Agreement. The idea/expression distinction is properly raised in connection with the issue of substantial similarity, which is not presently before the court.

Therefore, the court concludes that items I3, I5, I12, F18, F19, and G22 on Apple's List are licensed to Microsoft pursuant to the 1985 Agreement and, assuming that Microsoft licensed the use of these visual displays to HP, are protected from Apple's claim of copyright infringement.

The following items on Apple's List are unlicensed and pertain to NewWave: A1, A8, B1, B2, D1–3, G1, G2, G4, G5, G6, G10–33, H1–6, I1, I2, I4, I6–11, J8–11 (55 items total).

---

**11.** Sewell Declaration with Special Appendix, Exh. 39 and 40.

IV. *APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING VALIDITY OF ITS COPYRIGHTS AND DEFENDANTS' AFFIRMATIVE DEFENSES.*

Apple's motion seeks summary adjudication declaring Apple's audiovisual copyrights valid and dismissing defendants' affirmative defenses. Following lengthy consideration, the court has concluded that the present record is insufficient to conclude that there are no triable issues of fact as to these matters, with two exceptions: (1) HP's claim of Apple's fraud on the Copyright Office, and (2) the originality of Apple's visual displays.

■■■ To prevail on a claim of copyright infringement, a plaintiff must establish both ownership of a valid copyright and copying by the defendant. *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 206 (9th Cir.1988); *Sid & Marty Krofft Television Prod., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977); *Atari, Inc. v. North American Philips Consumer Elec. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982); *see* M. Nimmer, 3 THE LAW OF COPYRIGHT § 13.01 (1990). Because direct evidence of copying is rare, copying may be established by circumstantial evidence of access and substantial similarity of ideas and the expression between the copyrighted work and the alleged infringing work. *Data East*, 862 F.2d at 206.

Apple seeks partial summary judgment on the first issue—the validity of its copyrights on the Lisa and Macintosh programs and also asks the court to strike the defendants' affirmative defenses.[12] In support of its motion, Apple refers to the transcript of the April 14, 1989 Status Conference, at 13–14, in which counsel for Microsoft and HP stipulated to the presumptively valid copyright registration of Apple's works in issue. Apple's complaint listed the allegedly infringed works and the copyright registration numbers. In Microsoft's answer, Microsoft admitted that Apple received the certificates of registration for the works in suit. Microsoft's Answer, ¶ 10.

■■■ A certificate of registration from the Copyright Office constitutes "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c).[13] This presumption of validity is rebuttable. *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980) (evidence in the record casting doubt on validity rebuts presumption); *Past Pluto Prod. Corp. v. Dana*, 627 F.Supp. 1435 (S.D.N.Y.1986). The presumptive validity of a certificate of registration may be resolved on summary judgment. *S.O.S. v. Payday*, 886 F.2d at 1086 (citing *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1322 (9th Cir.1986)). Furthermore, the presumption of copyright validity may not be overcome on the basis of fraud without proof that omissions in copyright application were intentional. *Eckes v.*

12. Microsoft's affirmative defenses are: (1) Apple granted Microsoft a royalty-free license to use the visual displays in issue pursuant to the 1985 Agreement; (2) Apple is precluded by waiver or estoppel from any claims of ownership or infringement against Microsoft products; (3) Apple has failed to state a claim for contributory infringement; (4) Apple's visual displays are functional and hence barred from copyright protection under 17 U.S.C. § 102(b); (5) Apple's visual displays are not original to Apple and are not entitled to copyright protection under 17 U.S.C. § 102(a); (6) Apple's visual displays are common and ordinary expressions of unprotectible ideas and are not susceptible to copyright protection under the *scenes a faire* doctrine of copyright law; (7) no substantial similarity exists between Apple's visual displays and Microsoft's Windows 2.03 software product;

and (8) Apple's claim of unfair competition is preempted by 17 U.S.C. § 301.

HP's affirmative defenses are: (1) Apple's visual displays are unprotectible ideas, indispensable expression, and/or non-original expression; (2) fraud on the Copyright Office; (3) Apple's visual displays are functional; and (4) Apple's works are entitled to a limited scope of copyright protection.

13. Section 410(c) provides:

In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

*Card Prices Update*, 736 F.2d 859 (2d Cir. 1984). HP opposes Apple's motion seeking a determination of validity of Apple's certificates on two grounds: fraud on the Copyright Office and lack of originality.[14]

### A. Fraud on the Copyright Office.

HP contends that Apple's failure to disclose to the Copyright Office that its works were based upon preexisting works should overcome the presumption of validity of Apple's copyright registrations. HP has provided the court with depositions and computer magazine articles showing that the Apple Lisa/Macintosh graphic user interface was strongly influenced by the Xerox programs, Smalltalk and Star. While it is undisputed that the Lisa and Macintosh designers were influenced by Xerox's Smalltalk program, which used a mouse and overlapping windows, and by Xerox's Star workstation, which extensively used icons, such borrowing of ideas does not deprive Apple's works of their presumption of copyright validity. To require a designer of a computer graphic user interface to acknowledge sources of artistic influence would be similar to expecting Roy Lichtenstein to declare in a copyright registration that a particular work is derivative of a named comic strip. HP's contention that Apple's failure to disclose the borrowed Xerox material is in itself adequate to overcome the presumption of validity is unsupported by any binding precedent. Furthermore, "[a]bsent intent to defraud and prejudice, inaccuracies in copyright registration do not bar actions for infringement." *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir.1984). HP has not provided the court with any evidence of Apple's intent to deceive the Copyright Office and nevertheless claims that "a triable issue of fact as to Apple's intent remains, and summary judgment cannot be granted to Apple on the record now before the Court." HP's Opposition to Apple's Motion for Partial Summary Judgment at 15–16.

The parties have recently sent letter briefs to the court regarding the December 11, 1990 decision and order in *Ashton–Tate Corp. v. Fox Software, Inc.*, 760 F.Supp. 831 (C.D.Cal.1990). HP relied on the legal conclusion that Ashton–Tate's failure to disclose that its programs were derived from a computer software program in the public domain invalidated Ashton–Tate's copyrights on its dBase line of computer software programs.[15] This court finds the two-page *Ashton–Tate* decision unhelpful to the resolution of the pending motions.

HP's contention that Apple's copyrighted works are derivative works is meritless. A derivative work is one which is substantially copied from a prior work. *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir.1984), *cert. denied* 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985). The Ninth Circuit has stated that a work will be deemed a derivative work "only if it would be considered an infringing work if the material which it has derived from a prior work had been taken without the consent of a copyright proprietor of such prior work." *Id.* at 1357 (quoting from *United States v. Taxe*, 540 F.2d 961, 965 n. 2 (9th Cir.1976)). All works are derived to a certain degree from pre-existing works. A derivative work within the meaning of the copyright law, however, is one which substantially borrows the expression of ideas from an existing work. M. Nimmer, 1 THE LAW OF COPYRIGHT § 3.01 (1990). HP has provided no evidence demonstrating that Apple's works in suit could be considered to have infringed Xerox's copyrights or that Apple's works substantially borrowed expressions of ideas from Xerox's Smalltalk or Star programs.

The purpose of summary judgment is to pierce the pleadings and assess the proof to determine whether a genuine need for trial exists. Advisory Committee Note to 1963 Amendment of Fed.R.Civ.P. 56(e).

**14.** Microsoft also contests the originality of Apple's works.

**15.** HP's assertion in its letter brief that it has not yet taken any discovery on the subject of Apple's inequitable intent does not preclude summary adjudication of that issue. HP has had ample time to conduct discovery on the issues of the originality and validity of Apple's copyrights on the works in suit, including intent to deceive the Copyright Office. Judge Schwarzer afforded HP that opportunity.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Although inferences are to be drawn in favor of the nonmoving party, where the moving party has carried its burden under Fed.R.Civ.P. 56(c), the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Having reviewed the exhibits offered in connection with this issue, the court concludes there can be no triable issue that the Apple works in suit substantially borrowed expressions of ideas from Xerox's Smalltalk or Star programs.

Finding no evidentiary basis for HP's claim that Apple intended to commit a fraud on the Copyright Office and finding that the Apple visual displays are not derivative of the Xerox Star or Smalltalk programs, the court concludes that HP has failed to establish that Apple perpetrated a fraud on the Copyright Office.

### B. Originality of Apple's visual displays.

HP disputes that Apple's copyrighted works were wholly original to Apple because those works are "at best derivative of the works of Xerox and others and more likely merely compilations of preexisting uncopyrightable material." HP's Opposition to Apple's Summary Judgment Motion, at 3.

■ The attacks of Microsoft and HP on the validity of Apple's copyrights on the basis of lack of originality misconstrue the copyright requirement of originality. The standard of originality required for copyrightability is minimal. *See Atari Games Corp. v. Oman*, 888 F.2d 878 (D.C.Cir.1989) (minimal degree of creativity required to support a copyright). To fulfill the originality requirement, a work need only be independently created by the author and embody a very modest amount of intellectual labor; novelty or uniqueness is not essential. *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n.*, 805 F.2d 663, 668 (7th Cir.1986), *cert. denied* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987); *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1223 (8th Cir.1986), *cert. denied* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). It has been said that the originality requirement is simply a prohibition of actual copying by the copyright holder. *Atari Games Corp.*, 888 F.2d at 882; *M. Kramer Mfg. v. Andrews*, 783 F.2d 421, 437 (4th Cir.1986).

■ In *Johnson Controls, Inc. v. Phoenix Control Systems*, 886 F.2d 1173 (9th Cir.1989), the court concluded that the existence of computer programs similar to plaintiff's program was insufficient to rebut the presumption of validity absent any evidence that plaintiff copied from the other programs. Similarly, although there is evidence that Apple's designers borrowed ideas from Xerox's Smalltalk and Star programs, there is no substantiation for the allegation that Apple copied protectible elements of expression from those programs. Indeed, photocopies of visual displays from the Smalltalk and Star programs within the parties' exhibits reveal scant similarity of expression between Xerox's and Apple's visual displays. HP's Documentary and Testimonial Evidence in Support of Motion for Summary Judgment, Exh. 222, 227, 237, 264, 361.

There being no triable issue of fact regarding fraud on the Copyright Office or lack of originality of Apple's works in suit, Apple's motion for partial summary judgment that: (1) Apple did not perpetrate a fraud on the Copyright Office; and (2) Apple's works in suit fulfill the copyright requirement of originality, is granted. Apple's motion for summary adjudication that its copyrights are valid is denied without prejudice to renewal. Accordingly, HP's affirmative defense regarding fraud on the Copyright Office and both HP and Microsoft's affirmative defenses of lack of originality are dismissed from the case. HP and Microsoft's defenses to infringement, such as functionality, scope of protection, merger and *scenes a faire* doctrines remain in issue and would be appropriately dis-

cussed in connection with an adjudication regarding substantial similarity.

## V. *REMAINING ISSUES.*

Microsoft and HP have asked the court for a determination that each of the remaining visual displays on Apple's List is not entitled to copyright protection because they are unprotectible ideas, *scenes a faire,* or expressions which are merged with or indispensable to the ideas they represent. Under Ninth Circuit precedent, it appears that the issue of merger of idea and expression can preclude a finding of substantial similarity, but has not been applied to the issue of the copyrightability of a work. *NEC Corp. v. Intel Corp.,* 10 U.S.P.Q.2d 1177, 1179 (N.D.Cal.1989); *see Data East,* 862 F.2d at 208; *Frybarger v. Int'l Business Mach. Corp.,* 812 F.2d 525, 530 (9th Cir.1987); *Sid & Marty Krofft,* 562 F.2d at 1167–69; *Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 742 (9th Cir.1971); *see also* M. Nimmer, 3 THE LAW OF COPYRIGHT § 13.03[B][3] (1990).

■ In *Aliotti v. R. Dakin & Co.,* 831 F.2d 898 (9th Cir.1987), the Ninth Circuit incorporated the line of cases involving the merger and *scenes a faire* doctrines into the "analytical framework of the intrinsic test [the substantial similarity of expression test]." *Id.* at 901. Accordingly, such copyright doctrines, addressing the protectibility of elements of expression, are appropriately addressed in connection with the second half of the *Krofft* bifurcated test of substantial similarity of ideas and expressions.

■ Although the court did invite motions addressing the issue of "scope of protection" of Apple's copyrights and the merger doctrine has been applied in other circuits to preclude copyrightability of a particular work, the court must follow the law of the Ninth Circuit. Since the court did not invite motions regarding the issue of substantial similarity, a resolution whether the works in suit are not substantially similar because of the merger of idea and expression in Apple's visual displays is premature at this time. Unfortunately, a substantial portion of HP and Microsoft's moving papers are irrelevant to the disposition of the current motions.

## VI. *DISCOVERY SCHEDULE.*

Counsel are directed to contact the deputy clerk to schedule a status conference not less than 45 days from the date of this order. The court hereby imposes a full disclosure obligation on the parties. In advance of the status conference, therefore, the parties should meet and confer and, with respect to each claim and defense which the party asserts, disclose the following: (1) the location of all documents and other tangible evidence which the party has reason to believe pertain to each claim or defense without regard to the party's access to or control over the location; (2) the identity of each person believed to have knowledge of each claim or defense without regard to whether the person is aligned with the party and a brief narrative statement describing the party's belief as to the person's knowledge; and (3) an outline of the law applicable to each claim or defense. Based upon this exchange, the parties shall prepare a plan of discovery which shall be contained in a *single* joint status conference statement which must be filed not less than five days in advance of the status conference.

IT IS SO ORDERED.