**Herbert L. COHEN, dba Bizarre Music, Co., Plaintiff-Appellant,**

v.

**PARAMOUNT PICTURES CORP., a corporation, Defendant-Appellee.**

**No. 87–6093.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1988.

Decided April 27, 1988.
As Amended July 22, 1988.

---

Evan S. Cohen, Cohen and Luckenbacher, Los Angeles, Cal., for plaintiff-appellant.

Howard King, Gang, Tyre, Ramer & Brown, Inc., Los Angeles, Cal., for defendant-appellee.

Before HUG, TANG and NOONAN, Circuit Judges.

HUG, Circuit Judge:

This case involves a novel issue of copyright law: whether a license conferring the right to exhibit a film "by means of television" includes the right to distribute videocassettes of the film. We hold it does not.

## FACTS

Herbert Cohen is the owner of the copyright in a musical composition entitled "Merry–Go–Round" (hereinafter "the composition"). On May 12, 1969, Cohen granted H & J Pictures, Inc., a "synchronization" license, which gave H & J the right to use the composition in a film called "Medium Cool" and to exhibit the film in theatres and on television.[1] Subsequently, H & J assigned to Paramount Pictures all of its rights, title, and interest in the movie "Medium Cool," including all of the rights and interests created by the 1969 license from Cohen to H & J. Sometime later, Paramount furnished a negative of the film to a videocassette manufacturer, who made copies of the film—including a recording of the composition—and supplied these copies to Paramount. Paramount, in turn, sold approximately 2,725 videocassettes of the film, receiving a gross revenue of $69,024.26 from the sales.

On February 20, 1985, Cohen filed suit against Paramount in federal district court alleging copyright infringement. Cohen contended that the license granted to H & J did not confer the right to use the composition in a reproduction of the film in videocassettes distributed for home display. The parties stipulated to the facts and both filed motions for summary judgment. The district court entered judgment in favor of Paramount, and Cohen appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1982).[2]

## DISCUSSION

We review a grant of summary judgment de novo. Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986). We must determine, viewing the evidence in the light most favorable to Cohen, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986).

---

1. Cohen and H & J also executed a "master use" license. However, the language of that license, as quoted in the district court's Statement of Uncontroverted Facts, is not helpful in determining precisely what rights were conferred by Cohen to H & J.

2. We note that federal jurisdiction is proper in this case because the complaint "makes out an infringement claim and seeks remedies expressly created by federal copyright law." Vestron, Inc. v. Home Box Office, Inc., 839 F.2d 1380, 1382 (9th Cir.1988). Specifically, the complaint requests relief pursuant to 17 U.S.C. § 502 (injunctive relief); § 503 (impoundment and destruction of infringing articles); and § 504 (damages and profits) (1982).

The interpretation of a contract presents a mixed question of law and fact. Where, as here, the district court's decision is based on an analysis of the contract language and the application of contract law, our review is *de novo*. *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir.1985).

To resolve this case, we must examine the terms of the license, in order to determine whether the license conveyed the right to use the composition in making and distributing videocassette reproductions of "Medium Cool." The document begins by granting the licensee the "authority ... to record, in any manner, medium, form or language, the words and music of the musical composition ... with ['Medium Cool'] ... to make copies of such recordings and to perform said musical composition everywhere, *all in accordance* with the terms, conditions, and limitations hereinafter set forth...." (Emphasis added.) Paragraph 4 states, "The ... license herein granted to perform ... said musical composition is granted for: (a) The exhibition of said motion picture ... to audiences in motion picture theatres and other places of public entertainment where motion pictures are customarily exhibited .... (b) The exhibition of said motion picture ... *by means of television* ..., including 'pay television', 'subscription television' and 'closed circuit into homes' television...." (Emphasis added.) Finally, paragraph 6 of the license reserves to the grantor "all rights and uses in and to said musical composition, except those herein granted to the Licensee...." Although the language of the license permits the *recording and copying* of the movie with the musical composition in it, in any manner, medium, or form, nothing in the express language of the license authorizes *distribution* of the copies to the public by sale or rental.

One of the separate rights of copyright, as enumerated in section 106 of the Copyright Act, is the right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). Thus, the right to distribute copies of the videocassettes by sale or rental remained with the grantor under the reservation of rights provision in paragraph 6, unless in some way it is encompassed within the right to *perform* the work.

■ The limitation on the right to perform the synchronization with the composition in it is found in paragraph 4 and that paragraph limits the right to perform, or to authorize others to perform, to: 4(a) exhibition of the motion picture to audiences in motion picture theatres and other places of public entertainment where motion pictures are customarily shown, and 4(b) exhibition of the motion picture by means of television, including pay television, subscription television, and "closed circuit into homes" television.

■ It is obvious that the distribution of videocassettes through sale and rental to the general public for viewing in their homes does not fit within the purpose of category 4(a) above, which is restricted to showing in theatres and other similar public places. Paramount argues that it fits within 4(b), in that the distribution of videocassettes for showing in private homes is the equivalent of "exhibition by means of television." Paragraph 4(b) grants to Paramount the limited right to authorize broadcasters and cable television companies to broadcast the movie over the airwaves or to transmit it by cable, microwave, or some such means from a central location. The words of that paragraph must be tortured to expand the limited right granted by that section to an entirely different means of making that film available to the general public—the distribution of individual videocassettes to the general public for private "performances" in their homes. The general tenor of the section contemplates some sort of broadcasting or centralized distribution, not distribution by sale or rental of individual copies to the general public. Furthermore, the exhibition of the videocassette in the home is not "by means of television." Though videocassettes may be exhibited by using a television monitor, it does not follow that, for copyright purposes, playing videocassettes constitutes "exhibition by television." Exhibition of a film on television differs fundamentally from exhibition by means of a videocassette recorder ("VCR"). Television requires an intermediary network, station, or cable to send the television

signals into consumers' homes. The menu of entertainment appearing on television is controlled entirely by the intermediary and, thus, the consumer's selection is limited to what is available on various channels. Moreover, equipped merely with a conventional television set, a consumer has no means of capturing any part of the television display; when the program is over it vanishes, and the consumer is powerless to replay it. Because they originate outside the home, television signals are ephemeral and beyond the viewer's grasp.

Videocassettes, of course, allow viewing of a markedly different nature. Videocassette entertainment is controlled within the home, at the viewer's complete discretion. A consumer may view exactly what he or she wants (assuming availability in the marketplace) at whatever time he or she chooses. The viewer may even "fast forward" the tape so as to quickly pass over parts of the program he or she does not wish to view. By their very essence, then, videocassettes liberate viewers from the constraints otherwise inherent in television, and eliminate the involvement of an intermediary, such as a network.

Television and videocassette display thus have very little in common besides the fact that a conventional monitor of a television set may be used both to receive television signals and to exhibit a videocassette. It is in light of this fact that Paramount argues that VCRs are equivalent to "exhibition by means of television." Yet, even that assertion is flawed. Playing a videocassette on a VCR does not require a standard television set capable of receiving television signals by cable or by broadcast; it is only necessary to have a monitor capable of displaying the material on the magnetized tape.

Perhaps the primary reason why the words "exhibition by means of television" in the license cannot be construed as including the distribution of videocassettes for home viewing is that VCRs for home use were not invented or known in 1969, when the license was executed. The parties both acknowledge this fact and it is noted in the order of the district judge. Thus, in 1969—long before the market for videocassettes burgeoned—Cohen could not

have assumed that the public would have free and virtually unlimited access to the film in which the composition was played; instead, he must have assumed that viewer access to the film "Medium Cool" would be largely controlled by theatres and networks. By the same token, the original licensee could not have bargained for, or paid for, the rights associated with videocassette reproduction. *See* Comment, Past Copyright Licenses and the New Video Software Medium, 29 U.C.L.A.L.Rev. 1160, 1184 (1982). The holder of the license should not now "reap the entire windfall" associated with the new medium. *See id.* As noted above, the license reserved to the grantor "all rights and uses in and to said musical composition, except those herein granted to the licensee...." This language operates to preclude uses not then known to, or contemplated by the parties. Thus, by its terms, the contract did not convey the right to reproduce and distribute videocassettes. That right, having not been granted to the licensee, was among those that were reserved.

■ Moreover, the license must be construed in accordance with the purpose underlying federal copyright law. Courts have repeatedly stated that the Copyright Act was "intended definitively to grant valuable, enforceable rights to authors, publishers, etc., ... 'to afford greater encouragement to the production of literary works of lasting benefit to the world.'" *Washington Publishing Co. v. Pearson,* 306 U.S. 30, 36, 59 S.Ct. 397, 400, 83 L.Ed. 470 (1939); *Scott v. WKJG, Inc.,* 376 F.2d 467, 469 (7th Cir.1967) ("A copyright is intended to protect authorship. The essence of a copyright protection is the protection of originality rather than novelty or invention.") *Jondora Music Publishing Co. v. Melody Recordings, Inc.,* 506 F.2d 392, 395 (3d Cir.) (as amended), *cert. denied,* 421 U.S. 1012, 95 S.Ct. 2417, 44 L.Ed. 2d 680 (1975) ("The copyright law is enacted for the benefit of the composer...."). We would frustrate the purposes of the Act were we to construe this license—with its limiting language—as granting a right in a medium that had not been introduced to the domestic market at the time the parties entered into the agreement.

Paramount directs our attention to two district court cases, which, it contends, compel the opposite result. Both, however, involve licenses that contain language markedly different from the language in the license at hand.

*Platinum Record Company, Inc. v. Lucasfilm, Ltd.*, 566 F.Supp. 226 (D.N.J.1983), involved an agreement executed in 1973 in which plaintiff's predecessor in interest granted Lucasfilm, a film producer, the right to use four popular songs on the soundtrack of the motion picture *American Graffiti*. The agreement expressly conferred the right to "exhibit, distribute, exploit, market and perform said motion picture, its air, screen and television trailers, perpetually throughout the world *by any means or methods now or hereafter known*." *Id.* at 227 (emphasis added). Lucasfilm produced *American Graffiti* under a contract with Universal. *Id.* The film was shown in theatres and on cable, network, and local television. In 1980, a Universal affiliate released the film for sale and rental to the public on videocassettes. *Id.* Plaintiffs brought suit against Universal and its affiliate, alleging that the agreement did not give them the right to distribute the film on videocassettes.

The district court granted summary judgment in favor of the defendants. *Id.* at 226. It reasoned that the language in the agreement conferring the right to exhibit the film " 'by any means or methods now or hereafter known' " was "extremely broad and completely unambiguous, and precludes any need in the Agreement for an exhaustive list of specific potential uses of the film.... It is obvious that the contract in question may 'fairly be read' as including newly developed media, and the absence of any specific mention in the Agreement of videotapes and video cassettes is thus insignificant." *Id.* at 227.

Similarly, the district court in *Rooney v. Columbia Pictures Industries, Inc.*, 538 F.Supp. 211 (S.D.N.Y.1982), *aff'd*, 714 F.2d 117 (2d Cir.1982), *cert. denied*, 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983) found that the contracts in question, which granted rights to exhibit certain films, also gave defendants the right to sell videocassettes of the films. *Id.* at 228. Like the contract in *Platinum*, the contracts in *Rooney* contained sweeping language, granting, for example, the right to exhibit the films "by any present or *future* methods or means," and by "any other means *now known or unknown*." *Id.* at 223 (emphasis added). The court stated, "The contracts in question gave defendants extremely broad rights in the distribution and exhibition of [the films], plainly intending that such rights would be without limitation unless otherwise specified and further indicating that future technological advances in methods of reproduction, transmission, and exhibition would inure to the benefit of defendants." *Id.* at 228.

In contrast to the contracts in *Platinum* and *Rooney*, the license in this case lacks such broad language. The contracts in those cases expressly conferred the right to exhibit the films by methods yet to be invented. Not only is this language missing in the license at hand, but the license also expressly reserves to the copyright holder all rights not expressly granted. We fail to find the *Rooney* and *Platinum* decisions persuasive.[3]

### CONCLUSION

We hold that the license did not give Paramount the right to use the composition in connection with videocassette production and distribution of the film "Medium Cool." The district court's award of summary judgment in favor of Paramount is reversed.

**REVERSED and REMANDED.**

---

**3.** Paramount argues that those courts did not rest their holdings entirely on the broad language of the contracts, but that they also found, as a general proposition, that exhibition by means of a home videocassette player is equivalent to television exhibition. *See Rooney*, 538 F.Supp. at 228 ("As defendants point out, whether the exhibition apparatus is a home videocassette player or a television station's broadcast transmitter, the films are 'exhibited' as images on home television screens.") *See also Platinum*, 566 F.Supp. at 227–28. To the extent those courts may have equated exhibition by means of television with home video display, we reject their conclusions.