James BROWN, et al., Plaintiffs,

v.

**TWENTIETH CENTURY FOX FILM CORPORATION, et al., Defendants.**

**Civ. A. No. 91–3289–LFO.**

United States District Court, District of Columbia.

July 29, 1992.

Thomas A. Hart, Jr., Washington, D.C. (Reginald Simmons, Aiken, S.C., of counsel), for plaintiffs.

Richard S. Hoffman, Robert J. Shaughnessy, Robert M. Cary, Williams & Connolly, Washington, D.C., for defendants.

MEMORANDUM

OBERDORFER, District Judge.

The complaint[1] in this case challenges defendants' use in their movie "The Commitments" of a 27–second "clip" of plaintiff's performance on a 1965 television show. The complaint alleges violations of the Copyright Act, 17 U.S.C. § 101 *et seq.,* the Lanham Act, 15 U.S.C. § 1051 *et seq.,* as well as several common-law causes of action including unfair competition and violation of the right of publicity. The matter comes before the Court on defendants' motion for summary judgment. Plaintiff has filed an opposition to the motion and several supplements thereto, and a hearing was held on June 15, 1992. For the reasons that follow, defendants' motion will be granted.

I.

Rule 56(c) of the Federal Rules of Civil Procedure directs the Court to grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Evaluation of a motion for summary judgment requires a view of the facts in the light most favorable to the non-moving party. That is, if there is evidence in the record from which a reasonable jury could find for the non-moving party in accordance with the governing law, summary judgment must be denied. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Washington Post Co. v. Department of Health & Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989). In this case, there is no genuine issue as to any of the following material facts.

---

**1.** Also named as plaintiff in the complaint is James Brown Enterprises ("JBE"). The complaint states that JBE is the administrative arm of Mr. Brown's professional organization. For simplicity's sake, plaintiffs will be referred to herein as a single entity.

**2.** The complaint states that plaintiff is "known throughout the world as 'The Godfather of Soul.' It alleges that he is one of the most influential living musicians in the world and is one of the greatest live performers of all time. He is a

Defendants are the owners/distributors of the successful motion picture "The Commitments" (the "film"), which was released in 1991. Plaintiff is the well-known entertainer and songwriter James Brown.[2] The film tells the story of a group of young Irishmen and women who form a soul music band. In the film the leader of the band, Jimmy, tries to teach the band members what it takes to be successful soul music performers. Toward that end, Jimmy shows the band members a videotape of plaintiff's energetic performance of the song "Please, Please, Please" (the "performance"). This performance comes from plaintiff's appearance in 1965 on a program called the TAMI Show. Portions of the performance are shown in "The Commitments" in seven separate "cuts" for a total of 27 seconds, sometimes in the background of a scene and sometimes occupying the entire screen.[3] Plaintiff's name is not mentioned at all during this relatively brief scene. It is mentioned only once later in the film, when Jimmy urges the band members to abandon their current musical interests and tune into the great soul performers, including plaintiff:

> Listen, from now on I don't want you listening to "Guns & Roses" and "The Soup Dragons." I want you on a strict diet of soul. James Brown for the growls, Otis Redding for the moans, Smokey Robinson for the whines, and Aretha for the whole lot put together.

On October 22, 1964, prior to a rehearsal for the TAMI Show performance, plaintiff entered into a letter agreement with the producer of the TAMI Show, Electronovision Productions, Inc. ("Electronovision"). The relevant portions of this agreement, which are determinative of the outcome of this case, are as follows:

Grammy award winner, icon of funk, pop, soul, R & B and dance music and one of the original inductees into the Rock and Roll Hall of Fame." Complaint ¶ 5.

**3.** In addition, the soundtrack from the clip, without the accompanying video, is played as background for a total of one minute 22 seconds, although during much of this time it is nearly inaudible.

4. *Grant of Rights*

A. You hereby grant to Producer the sole and exclusive right to photograph or otherwise reproduce in connection with the Theatrofilm [4] all or any part of your acts, poses, plays and appearances of every kind and nature made or done by you in connection with the Performances and/or your services hereunder; and all instrumental, musical or other sound effects produced by you in connection with the Performances and/or your services hereunder; to reproduce, re-record and transmit the same in connection with the Theatrofilm in conjunction with such acts, poses, plays and appearances, and perpetually and throughout the world to exhibit, transmit, reproduce, distribute, broadcast and exploit, and license or permit others to exhibit, transmit, reproduce, distribute, broadcast and exploit, any or all of such photographs, reproductions and recordations in connection with all or any portion of the Theatrofilm, or the advertising or exploitation thereof, in and by all media and means whatsoever.

B. Producer shall have the right throughout the world to use and display, and to license or permit others to use and display, your name and likeness for advertising or publicizing the Performance in conjunction with the Theatrofilm provided, however, that Producer shall not have the right to utilize your name, voice or likeness in connection with any so-called "commercial tie-ups." Without limiting the generality of the foregoing, Producer shall have the right to use your name and likeness in the Theatrofilm and issued in connection with the advertising and exploitation thereof....

In consideration for his performance on the show and this grant of rights to the producer, plaintiff was paid the sum of $15,-000.

In December 1984, Electronovision transferred all of its interests, including its rights in plaintiff's TAMI Show performance, to Screen Entertainment. Screen Entertainment subsequently granted to "dick clark" teleshows, inc. a limited transfer of the copyright in the TAMI Show for television use, expressly reserving the copyright for movie theater release. In 1985, Screen Entertainment merged with UPA Productions of America ("UPA"). On September 11, 1990, defendant Beacon Communications ("Beacon") acquired from UPA the right to use "no more than 2 minutes of the song 'Please, Please' (sic) by James Brown from the TAMI Show" for all "theatrical, non-theatrical, videocassette and videodisc" uses through the world. Additionally, Beacon obtained from "dick clark" media archives the television rights to the TAMI Show performance. Finally, Beacon separately obtained the right to use the musical composition and lyrics of the song "Please, Please, Please" from the entities to whom plaintiff had transferred the copyright in 1956.

## II.

Plaintiff contends that the 1964 letter Agreement is ambiguous with respect to whether the grant of rights included the right to use his performance in films, film promotions and videocassettes. He argues that this ambiguity creates a factual issue that must be resolved by a jury. It is a question of law, for court decision in the first instance, whether a contract is ambiguous, or whether it is clear and therefore subject to application as a matter of law. *See Brobeck, Phleger & Harrison v. Telex Corp.,* 602 F.2d 866, 871 (9th Cir.) (applying California law, which governs the interpretation of the 1964 agreement), *cert. denied,* 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir.1980). In this case, the letter agreement is clear and unambiguous, and

---

**4.** The term "Theatrofilm" was introduced and defined in a prior portion of the letter agreement as follows:

This letter, when accepted by you, will confirm your employment by the undersigned (the "Producer") to render your musical performing services in connection with the production of a Theatrofilm photoplay of a teenage music show (the "Theatrofilm").

embraces the uses defendants made of the TAMI Show performance.

The key portion of the letter Agreement provides that plaintiff grants to Electronovision the sole and exclusive right "perpetually and throughout the world to exhibit, transmit, reproduce, distribute, broadcast and exploit, and license or permit others to exhibit, transmit, reproduce, distribute, broadcast and exploit, any or all of such photographs, reproductions and recordations in connection with all or any portion of the Theatrofilm ... in and by all media and means whatsoever." Plaintiff urges the Court to focus on the phrase "in connection with." Plaintiff argues that this phrase limits the Producer's right to "reproduce, distribute, [or] broadcast ..." the performance only "in connection with" the original TAMI show itself—in other words, the Producer could license and distribute the show itself (such as in the form of television syndication) and could use plaintiff's performance to advertise the show, but could not reproduce or license the reproduction of the performance for use in entirely separate contexts such as a full-length motion picture.

As a matter of law the letter Agreement is not reasonably susceptible to this limited interpretation. The only reasonable interpretation of this contractual language is that the phrase "in connection with all or any portion of the Theatrofilm" modifies "photographs, reproductions and recordations," not, as plaintiff urges, the list of permissible uses earlier in the passage. The Producer is at liberty to exhibit, transmit, reproduce, etc. all photographs, reproductions and recordations "in connection with" the Theatrofilm; in other words, not *any* photographs, reproductions and recordations of plaintiff, but only those taken or

made "in connection with" the Theatrofilm. The fact that the Agreement expressly permits the reproduction and license to reproduce a "portion" of the performance indicates that the contracting parties contemplated the later use of the performance as segments of other larger projects. It is unclear how the Producer could conceivably reproduce or license the reproduction of a "portion" of the performance "in connection with the Theatrofilm." Moreover, plaintiff's limiting interpretation would render this portion of the "Grant of Rights" provision virtually meaningless, since other portions of the provision separately authorize the Producer to "photograph or otherwise reproduce" plaintiff's performance itself.

■ Plaintiff has submitted considerable extrinsic evidence to support his assertion that the intent of the parties was consistent with his narrow interpretation of the contractual language.[5] It is true that under California law, courts take a "permissive approach to extrinsic evidence in contract interpretation." *Barris Indus., Inc. v. Worldvision Enterprises, Inc.,* 875 F.2d 1446, 1450 (9th Cir.1989). Even under this permissive approach, however, "if the extrinsic evidence advances an interpretation to which the contract is not reasonably susceptible, the extrinsic evidence is not admissible." *Id.* Therefore, the mere existence of extrinsic evidence supporting a proffered alternative meaning does not foreclose summary judgment where the contract is not reasonably susceptible to that proffered interpretation. *Id.; see also Brobeck, Phleger & Harrison v. Telex Corp.,* 602 F.2d at 871. For these reasons, the 1964 Agreement is not reasonably susceptible to the interpretation suggested by

---

5. For example, plaintiff has submitted his own affidavit and the affidavit of his agent supporting his interpretation of the agreement, as well as materials suggesting that "industry practice" is to obtain the consent of the performer as well as the copyright holder when using "clips" such as the footage used by defendants in this case. In addition, plaintiff has submitted evidence that companies other than defendants, such as Capitol Records, secured plaintiff's consent with respect to use of the TAMI show footage. As

stated in the text, this extrinsic evidence cannot be used to advance an interpretation to which the contractual language is not reasonably susceptible. For this reason, the Court denies plaintiff's request under Fed.R.Civ.P. 56(f) that summary judgment not be granted until plaintiff has had the opportunity to seek discovery from other persons who may supply additional extrinsic evidence regarding the alleged intent of the 1964 agreement.

plaintiff; accordingly, the proffered extrinsic evidence is unavailing.

■■■ Plaintiff also argues that paragraph 4(B) of the agreement, which provides that the Producer "shall not have the right to utilize [plaintiff's] name, voice or likeness in connection with any so called commercial tie-ups," indicates that plaintiff did not intend unequivocally to surrender all rights in the performance, and therefore supports his narrow interpretation of the contractual language. Although the exact meaning of the phrase "commercial tie-ups" is not explained in the parties' submissions, plaintiff does not suggest that this language directly prohibits defendants' use of the TAMI Show performance in the film.[6] The mere fact that the Agreement prohibits a specific but unrelated use of the performance does not in any way indicate an intent to prohibit other uses. To the contrary, in light of the broadly worded transfer in paragraph 4(A), the prohibition of a single specified use in paragraph 4(B) indicates that all other uses not specifically prohibited are transferred to the grantee. This is consistent with the well-established rule placing the burden on the grantor to establish a pertinent reservation of rights. *See Bartsch v. Metro–Goldwyn–Mayer, Inc.*, 391 F.2d 150, 155 (2d Cir.), *cert. denied*, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968).

■■■ Next, plaintiff argues that the grant of rights in paragraph 4(A) cannot be read to encompass the right to the videocassette market, since it was not specified nor was it even in existence at the time of the 1964 Agreement. Plaintiff relies primarily on *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851 (2d Cir.1988). In *Cohen*, the court held that a grant of the right to use a musical composition in a film and to exhibit that film "by means of television" did not include the right to release the film on videocassette. The court reasoned that exhibition by videocassette differs substantially from exhibition on television, particularly with respect to the amount of control that can be exercised by the exhibitor. *Id.* at 853–54. Indeed, the court found that the only similarity between the two media is that a videocassette is typically viewed on a television screen. *Id.* In this case, by contrast, there is no contractual language limiting the use of the performance to a specific medium. The courts have held that "[w]here … a party has acquired a contractual right which may fairly be read as extending to media developed thereafter," the other party may not escape that part of the agreement by showing that the specific nature of the new development was not foreseen. *Rooney v. Columbia Pictures Indus., Inc.*, 538 F.Supp. 211, 229 (S.D.N.Y.) (holding that agreement granting right to exhibit motion picture "by any present or future methods or means" embraced the right to exhibit motion picture on videocassette), *aff'd without op.*, 714 F.2d 117 (2d Cir.1982), *cert. denied*, 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983); *see also Platinum Record Co. v. Lucasfilm, Ltd.*, 566 F.Supp. 226 (D.N.J.1983) (grant of right to exhibit film by "any means or methods now or hereafter known" embraced videocassette release). In this case, the sweeping contractual language—which grants the right to reproduce the performance "perpetually and throughout the world … in and by all media and means whatever"—may "fairly be read" to include release on videocas-

---

6. The closest that the parties come to defining this phrase is the following passage in the declaration of Jack Bart, plaintiff's agent:

It was also the understanding of myself, James Brown and my father that the Producer of the show did not have the right to utilize the recorded performance of James Brown in connection with any so-called "commercial tie-ups." Mr. Brown has always been strictly opposed to his name being an endorsement for tobacco, cigarettes, pornography or other non-authorized uses.

Declaration of Jack Bart at 2. This indicates that the purpose of the commercial tie-up prohibition was to prevent the producer from using the TAMI show footage as a product endorsement. As discussed below, the Court concludes as a matter of law that no reasonable jury could conclude that defendants' use of the 27–second clip implies that plaintiff endorsed "The Commitments."

settes despite their non-existence at the time the agreement was made.

■ Finally, plaintiff asserts that the transfers from UPA and "dick clark" archives to Beacon contained language indicating that Beacon is obliged to secure plaintiff's consent to use of the clip in the film. First, plaintiff points to the following language in the 1980 transfer from "dick clark":

> Licensee represents, warrants, and agrees that it will at its sole expense, obtain all required rights, authorizations, consents, releases, and waivers and will pay all fees necessary for the use of the Material (collectively "Releases") including without limitation consents from all persons appearing in or rendering services in connection with the Material....

There is no inconsistency between this provision and defendants' position in this litigation. The provision merely obliges Beacon to secure all *required* rights and pay all *necessary* fees. In light of plaintiff's 1964 Agreement, his consent was neither required nor necessary.[7] Second, plaintiff points to the following passage in the transfer from UPA to Beacon:

> "The Commitments" production will be responsible for clearing [or] renewing any music publishing or music copyright rights [sic] with James Brown ...

What plaintiff fails to reveal, however, is that the *full* passage reads as follows:

> "The Commitments" production will be responsible for clearing [or] renewing any music publishing or music copyrights with James Brown, his music publishing or the appropriate performing arts organization.

As discussed above, defendants did in fact secure the right to use the lyrics and musical composition from the music publishing company holding the copyright in those works.

### III.

■ Plaintiff also argues that defendants' use of his name, likeness and persona violates his "right of publicity."[8] Because defendants lawfully acquired the right to use the TAMI Show performance, however, the alleged violation of the right of publicity cannot be based on their use of that performance. When the performance is put to one side, the only remaining use of plaintiff's "persona" is a single mention of his name, along with the names of several other entertainers, as a model soul performer whom the band members should study. This certainly does not constitute the type of wholesale appropriation that has been recognized as giving rise to a right-of-publicity claim. *Contrast Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (unauthorized telecast of plaintiff's entire carnival performance on news broadcast constitutes misappropriation). The fact that the scene containing plaintiff's TAMI Show performance was used by defendants in advertisements and promotional trailers for the film does not alter this conclusion; since defendants had the right to use the clip in the film, they certainly had the right to use that scene from the film in promotional activities.[9] There is no allegation that plaintiff's name, or any aspect of his persona other than his appearance in the TAMI Show clip as it appears in

---

**7.** This language from the 1980 "dick clark" transfer, moreover, is part of the small print on a pre-printed license form and obviously was not drafted with this particular transaction in mind.

**8.** Plaintiff also suggests that defendants' use of these elements infringed a copyright held by plaintiff. Copyright protection, however, extends only to works that are "fixed in [a] tangible medium of expression." 17 U.S.C. § 102(a).

**9.** *See Booth v. Curtis Pub. Co.,* 15 A.D.2d 343, 223 N.Y.S.2d 737, *aff'd,* 11 N.Y.2d 907, 228 N.Y.S.2d 468, 182 N.E.2d 812 (1962) (use in

advertisement for magazine of actress's photograph that had previously appeared in magazine was not actionable, because "the reproduction was used to illustrate the quality and content of the periodical in which it originally appeared"); *Namath v. Sports Illustrated,* 48 A.D.2d 487, 371 N.Y.S.2d 10 (1975) ("use of plaintiff's photograph was merely incidental advertising of defendant's magazine in which plaintiff had earlier been properly and fairly depicted"), *aff'd without op.,* 39 N.Y.2d 897, 386 N.Y.S.2d 397, 352 N.E.2d 584 (1976).

the film, was used by defendants to promote the product.

## V.

In Count III of the Complaint, Brown claims a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), contending that there is the likelihood of consumer confusion in the marketing of the film. Similarly, Count V alleges that defendants' use of the clip constitutes unfair competition. Plaintiff's allegation in both counts is that the film gives the false impression that plaintiff "created, authorized or approved" the use of the TAMI Show clip in the film. Complaint ¶ 34.

Section 43(a) of the Lanham Act and the tort of unfair competition have been applied in some cases in which the defendant's use of a celebrity's likeness or persona in connection with the marketing of its product gives rise to the false impression that the celebrity endorses the product. *See, e.g., New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1201 (9th Cir.1979). Under both section 43(a) of the Lanham Act and the common law of unfair competition, the "ultimate test" is whether consumers are likely to be confused as to origin or endorsement. *Id.* Summary judgment is appropriate where the plaintiff "cannot possibly show confusion as to source or sponsorship." *Pirone v. Curtis Management Group, Inc.,* 894 F.2d 579, 585 (2d Cir.1990). In this case, there is no evidence whatsoever that any viewers of "The Commitments" believed that plaintiff had endorsed the film or personally approved the use of the clip, nor could any reasonable jury reach that conclusion from watching the film.[10]

For the foregoing reasons, there are no genuine issues as to any material fact and

defendants are entitled to judgment as a matter of law.

---

10. In Count IV, plaintiff alleges a violation of Section 44 of the Lanham Act, which pertains to foreign nationals and international trademark disputes. *See* 15 U.S.C. § 1126. This section was intended to give U.S. nationals reciprocal rights under applicable treaties against foreign acts of unfair competition. *See generally L'Ai-*

*glon Apparel Inc. v. Lana Lobell, Inc.,* 214 F.2d 649, 652–54 (3d Cir.1954). The Complaint does not allege the involvement of any foreign national, and plaintiff makes no attempt to defend this count in its opposition to the summary judgment motion.