# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BEATRICE WELLES,
          *Plaintiff-Appellant,*

v.

TURNER ENTERTAINMENT COMPANY;
ENTERTAINMENT ACQUISITION
COMPANY, INC.,
          *Defendants-Appellees.*

No. 05-55742

D.C. No.
CV-04-03077-JFW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
April 16, 2007—Pasadena, California

Filed May 30, 2007
Amended September 11, 2007

Before: Jerome Farris and Ronald M. Gould, Circuit Judges,
and Kevin Thomas Duffy,* District Judge.

Opinion by Judge Gould

———————

*The Honorable Kevin Thomas Duffy, Senior United States District
Judge for the Southern District of New York, sitting by designation.

**COUNSEL**

Steven Ames Brown, San Francisco, California, for plaintiff-appellant Beatrice Welles.

David W. Quinto, Daryl M. Crone, Quinn Emanuel Urquhart Oliver & Hedges LLP, Los Angeles, California, for defendants-appellees Turner Entertainment Co. and Entertainment Acquisition Co.

**ORDER**

The opinion filed May 30, 2007 is amended as follows:

On page 6443 of the slip opinion, after the sentence "We hold that the contract is ambiguous regarding which party owns the right to exploit the *Citizen Kane* screenplay on home video," insert a footnote containing the following text:

> In so holding, we do not adopt a presumption against applying a grant of rights in "motion pictures" to

new technologies. Instead, we simply interpret the written contract of the parties in this case, as our precedent instructs. *See Maljack Prods., Inc. v. Good-Times Home Video Corp.*, 81 F.3d 881, 885 (9th Cir. 1996); *Cohen*, 845 F.2d at 854; *see also Boosey & Hawkes Music Publishers v. Walt Disney Co.*, 145 F.3d 481, 487 (2d Cir. 1998) (holding that "new-use analysis should rely on neutral principles of contract interpretation" and that "the language of the contract" governs). In some cases, a contract might permit the licensee to exploit the work in a new medium without a future technologies clause. For example, in *Maljack Productions*, we held that a licensee obtained the right to exploit certain music in a motion picture in a new medium when the license had no future technologies clause but granted the licensee "any and all worldwide rights under copyright and otherwise . . . to the music and musical composition recorded or contained upon the sound track of the Picture." 81 F.3d at 884-85 (alteration in original, internal quotation marks omitted). However, in this case, the Production Agreement, in addition to having no future technologies clause, granted RKO only motion picture and television rights in the *Citizen Kane* screenplay while granting Mercury broad, residual rights in the screenplay. It is thus not clear to us to whom the parties would have intended to grant the right to exploit the screenplay in new mediums.

With these amendments, the petition for rehearing is DENIED. No judge has requested a vote on the petition for rehearing en banc. The petition for rehearing en banc is DENIED. No further petitions will be entertained.

**OPINION**

GOULD, Circuit Judge:

Beatrice Welles, the daughter of screenwriter, filmmaker, and actor Orson Welles, filed suit against Turner Entertainment Co., Entertainment Acquisition Co., and other persons not parties to this appeal (collectively, "the defendants"), seeking a declaratory judgment that Beatrice Welles owns the copyright and home video rights to the motion picture *Citizen Kane* and seeking an accounting of the royalties she alleges she is owed from the profits of the motion picture. The district court granted summary judgment for the defendants. Because there are triable issues of fact, we vacate in part and remand.

**I**

The district court disposed of this case by summary judgment, so we consider the facts in the light most favorable to Beatrice Welles. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A**

Several separate contracts between Orson Welles, Mercury Productions, Inc. (a production company owned by Orson Welles), and RKO Radio Pictures, Inc. are integral to this case.[1]

On July 22, 1939, Orson Welles, Mercury, and RKO signed two agreements. The first agreement, between Mercury and RKO (the "Production Agreement"), provided that "[RKO] hereby engages [Mercury] to produce, direct and write the screenplay for the two (2) motion pictures hereinafter described, which are herein referred to as 'the Pictures.' "

---

[1]Beatrice Welles is the sole successor in interest to both Orson Welles and Mercury. According to Beatrice Welles's complaint, the defendants are the successors to the rights of RKO with respect to the contracts relevant to this appeal.

Section 13 of the Production Agreement determines who owns the fruits of the RKO-Mercury Production Agreement. That section begins:

> [RKO] shall own the negative and positive prints of each of the Pictures and all rights of every kind and nature in and to each Picture, and all parts thereof and all material, tangible and intangible, used therein, as soon as such rights come into existence, including, but not being limited to, the exclusive rights of distribution, exploitation, manufacture, recordation, broadcasting, televising (other than in connection with the advertising or exploitation of a commercial product or service), and reproduction by any art or method, and the literary, dramatic, musical and other works included in such Picture. . . . [Mercury] agrees that it will have no interest of any kind in either of the Pictures, except as in this agreement expressly provided.

Section 13 concludes with what the parties call the "original story" provision. The provision states:

> In case of any original story written by [Mercury] or any of its employees and used as the basis of either Picture, however, [RKO] shall acquire the motion picture and television rights in such story for such Picture only. [RKO] shall not remake any such Picture unless [Mercury] produces or directs the same or unless [RKO] buys the remake rights from [Mercury] at a price satisfactory to both parties. [Mercury] shall own the publication, radio, dramatic and other rights in any such story but shall not use the same in any way to compete with or injure the distribution of the Picture based on such story.

The second agreement entered into on July 22, 1939, between Orson Welles and RKO (the "Actor Agreement"),

provided that Orson Welles would play the leading male role in the two motion pictures produced pursuant to the Production Agreement and that Orson Welles would receive compensation of $30,000 plus a percentage of the net profits of the two motion pictures.

On December 26, 1939, Orson Welles and RKO amended the Actor Agreement by providing that Orson Welles would act in a third film in addition to the two pictures already agreed upon. On January 14, 1941, Mercury and RKO entered into another supplemental agreement, providing that the first motion picture Orson Welles and Mercury would make for RKO would be "based upon an original story, tentatively entitled 'Citizen Kane.' "

RKO released *Citizen Kane* on May 1, 1941. By December 15, 1944, *Citizen Kane* had not turned a profit, the second film produced under the Production Agreement, entitled *It's All True*, was not finished, and production had not commenced on the third film described in the supplemental agreement. To end their business relationship, Mercury, Orson Welles, and RKO entered into an agreement that terminated the Production and Actor Agreements and their amendments (the "Exit Agreement").

Signed on December 15, 1944, the Exit Agreement first outlined the prior agreements between the parties. It then stated:

> All fixed compensation payable to Mercury or Welles for services in connection with the first two motion pictures has been paid in full. Welles under the agreements of the parties is entitled, as contingent compensation, to twenty per cent (20%) of the net profits of the first two pictures as a unit. No net profits resulted from the sale and distribution of the first picture produced under the title "CITIZEN

KANE", and accordingly Welles is entitled to no contingent compensation.

It is now the mutual desire of the parties to terminate and cancel each and all of the existing agreements between [RKO] and Mercury and between [RKO] and Welles, and to mutually release and discharge each party to each of said agreements from all rights, duties, liabilities and obligations thereunder and from all claims, demands and causes of action of every kind and nature of each party as against the other party.

The Exit Agreement also gave Orson Welles the option to purchase from RKO for $200,000 all of the film recorded for *It's All True*.

## B

Beatrice Welles's complaint in this case asserted four claims. The first claim, seeking declaratory relief, alleged that the Exit Agreement restored to Orson Welles the copyright to the *Citizen Kane*[2] motion picture and that, even if the Exit Agreement did not restore all of Orson Welles's rights to *Citizen Kane*, the Production Agreement did not provide the defendants with the right to reproduce and distribute *Citizen Kane* on home video. The second claim, also seeking declaratory relief, asserted that the Exit Agreement only extinguished Orson Welles's past claims against the defendants and did not extinguish Orson Welles's right to collect 20% of the profits from *Citizen Kane* in the future, and, alternatively, that the

---

[2]In the district court, Beatrice Welles claimed ownership of three of Orson Welles's motion pictures: *Citizen Kane*, *Journey Into Fear*, and *The Magnificent Ambersons*. The summary judgment and this appeal, however, deal only with Beatrice Welles's claims against Turner Entertainment Co. and Entertainment Acquisition Co. relating to *Citizen Kane*. Beatrice Welles settled all of her other claims against all of the other defendants.

parties subsequently entered into a new agreement to share the income from *Citizen Kane*. The third and fourth claims sought damages for breach of contract and unfair business practices, respectively.

On December 6, 2004, the district court granted the defendants' motion for summary judgment on Beatrice Welles's first, second, and fourth claims, and for partial summary judgment on the third claim. On appeal, Beatrice Welles only argues that the district court erred in granting summary judgment on her first claim—seeking a declaratory judgment that she owns the copyright and home video rights to the motion picture *Citizen Kane*—and on her second claim—seeking an accounting.

## II

We review de novo the district court's decision to grant summary judgment. *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 n.11 (9th Cir. 2006). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As noted above, in reviewing a motion for summary judgment, we view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in favor of that party. *Anderson*, 477 U.S. at 255.

## III

Beatrice Welles first argues that there is a genuine issue of material fact about who owns the right to distribute *Citizen Kane* on home video. Before we address the merits of that argument, we must first decide whether Beatrice Welles's claim of copyright ownership is barred by the statute of limitations.

[1] A claim for copyright ownership is barred three years from the "plain and express repudiation" of copyright owner-

ship. *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000); *see* 17 U.S.C. § 507(b) ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."). The defendants argue (and the district court agreed) that because Beatrice Welles knew since 1991 that the defendants were releasing a home video version of *Citizen Kane*, her complaint, which she filed in 2003 and in which she seeks a declaration that she owns the home video rights to *Citizen Kane*, is time barred.

**[2]** However, the defendants point to no evidence that, before this litigation commenced, they plainly and expressly repudiated Beatrice Welles's claim to ownership of the home video rights to *Citizen Kane*. The evidence the defendants cite as notice that they were exploiting home video rights in *Citizen Kane* is correspondence between the attorneys for the Estate of Orson Welles and the defendants regarding the inclusion of the *Citizen Kane* screenplay in a "home video collector's edition gift set." While this might have informed Beatrice Welles that the defendants were distributing *Citizen Kane* on home video, it is not the plain and express repudiation of copyright ownership that our case law requires for the statute of limitations on a copyright ownership claim to begin running. *See Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996) (explaining that claims of copyright co-ownership "accrue when plain and express repudiation of co-ownership is communicated to the claimant"). Beatrice Welles's claim is not time barred.

We next turn to the merits of Beatrice Welles's claim that she owns the copyright to *Citizen Kane* on home video. Her complaint sought a declaration that she "alone owns all publication, radio, dramatic, home video and other rights in the story of *Citizen Kane*" and "that Mercury did not grant to RKO any right to exploit through home video devices sold to the public, the story of *Citizen Kane* as expressed in the screenplay and as embodied in the motion picture produced by Mercury of the same name." *Citizen Kane* was an "original

story" written by Mercury. Thus, whether RKO or Beatrice Welles owns the home video rights to *Citizen Kane* turns on an interpretation of Section 13 of the Production Agreement.

**[3]** Because the Production Agreement contains a New York choice of law provision, we apply New York's principles of contract interpretation in deciding this issue. While our task in a contract case is usually to give effect to terms of the contract as the parties understood them, *see Cromwell Towers Redevelopment Co. v. City of Yonkers*, 359 N.E.2d 333, 337 (N.Y. 1976); *Hartford Accident & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973); *Hopkins v. Conn. Gen. Life Ins. Co.*, 121 N.E. 465, 466 (N.Y. 1918), in this case it is unlikely that, in 1939, Mercury or RKO gave any thought to who would own the home video rights to *Citizen Kane*. In such a case, we look for the meaning that reasonable persons in the positions of the parties would have attached had they thought about the matter. *See* E. Allen Farnsworth, *Contracts* 465-66 (3d ed. 1999). As one New York court has explained:

> [F]aced with what may be . . . a failure to anticipate the future situation which arose, a court is faced not so much with the function of interpreting language as the parties intended, for their intention was incomplete, but of construing the language to accord with what would have been the intention and the honorable agreement of the parties if their attention had been drawn to the possible events as they actually were to occur.

*Herbert Rosenthal Jewelry Corp. v. St. Paul Fire & Marine Ins. Co.*, 249 N.Y.S.2d 208, 214 (N.Y. App. Div. 1st Dep't 1964); *see also Empire Props. Corp. v. Mfrs. Trust Co.*, 43 N.E.2d 25, 28 (N.Y. 1942) ("The intention of the parties must be sought for in the language used. To understand the language, we may put ourselves in their place and discern if possible the objects they had in view, and the motives which

dictated their choice of words. A wider meaning may thereby be disclosed." (internal quotation omitted)).

In interpreting the Production Agreement, we first determine whether its language is ambiguous or reasonably susceptible to more than one interpretation. If the language is unambiguous, we give effect to its plain meaning. *Nichols v. Nichols*, 119 N.E.2d 351, 353 (N.Y. 1954). If the language is ambiguous, or susceptible to more than one reasonable interpretation, we may consider extrinsic evidence in interpreting the agreement. *Hartford Accident & Indem. Co.*, 305 N.E.2d at 909. The interpretation of a contract is a question of law that we may decide unless the interpretation depends on the credibility of extrinsic evidence, in which case the interpretation of the contract is the task of the factfinder. *Mallad Constr. Corp. v. County Fed. Savs. & Loan Ass'n*, 298 N.E.2d 96, 99-100 (N.Y. 1973).

**[4]** To display publicly or distribute *Citizen Kane*, the defendants need two rights: First, the defendants need the right to display the motion picture. Second, because a motion picture is derived from its underlying screenplay, the defendants need the right to exploit the screenplay.

**[5]** In this case, the first paragraph of Section 13 deals with the first right the defendants need to distribute *Citizen Kane* on home video—the right to display the motion picture. Section 13 gives RKO "all rights of every kind and nature . . . including, but not being limited to, the exclusive rights of distribution, exploitation, manufacture, recordation . . . and reproduction by any art or method" in the motion pictures produced under the Production Agreement. This tells us that, as a general matter, the defendants, as successors to RKO, have the right to exploit in any manner the motion pictures produced pursuant to the Production Agreement, including *Citizen Kane*.

**[6]** However, to distribute *Citizen Kane* on home video, the defendants still need the right to exploit the screenplay from

which the *Citizen Kane* motion picture was derived. The original story provision deals with this issue. As noted above, the provision states that Mercury retained the rights to any screenplay written by Mercury or its employees. So, in order to allow RKO to display motion pictures derived from those screenplays, the Production Agreement provided RKO with certain rights in the "original stories" on which those motion pictures were based. Specifically, RKO acquired "the motion picture and television rights in such stor[ies] for such Picture[s] only," and Mercury reserved ownership of "the publication, radio, dramatic and other rights" in those original stories.

**[7]** Thus, the question before us is whether the defendants' "motion picture and television" rights in the *Citizen Kane* screenplay encompass the right to distribute the *Citizen Kane* screenplay on home video. On one hand, a reasonable argument can be made that distributing a motion picture on home video is simply an exploitation of the defendants' "motion picture" rights in the *Citizen Kane* screenplay. On the other hand, such a broad interpretation would render the additional grant of "television rights" to the defendants superfluous because if "motion picture" rights encompassed home video rights, "motion picture" rights could also be argued to encompass the right to display *Citizen Kane* on television. Thus, it seems to us unclear whether the parties would have intended RKO's motion picture and television rights in the *Citizen Kane* screenplay to include the right to exploit the *Citizen Kane* screenplay in home video form.

We dealt with a similar situation in *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851 (9th Cir. 1998). In that case, in 1969, a composer granted a license to the producer of a motion picture to use the composer's copyrighted music "for: (a) The exhibition of said motion picture . . . to audiences in motion picture theatres and other places of public entertainment where motion pictures are customarily exhibited" and "(b) The exhibition of said motion picture . . . by means of

television . . . , including 'pay television', 'subscription television' and 'closed circuit into homes' television." *Id.* at 853 (alterations in original, internal quotation omitted). The license reserved to the composer "all rights and uses in and to said musical composition, except those herein granted to the Licensee." *Id.* The district court had granted summary judgment to the producer, concluding that the licence's grant of the right to exhibit the picture "by means of television" included the right to distribute the picture on home video, but we reversed. *Id.* at 855. We emphasized that "VCRs for home use were not invented or known in 1969, when the license was executed" and noted the dissimilarities between display of a motion picture on television and distribution of a motion picture on home video, and we also pointed out that the license did not directly address which party owned the right to exploit music in media that had not yet been invented. *Id.* at 854.

**[8]** This case is similar to *Cohen*. Home video was not invented when the parties signed the Production Agreement in 1939, the right to distribute *Citizen Kane* on home video is quite different from the right to display *Citizen Kane* on television, and the Production Agreement does not specify who owns the right to exploit original story screenplays in media that had not been invented in 1939. Perhaps most importantly, the rights RKO acquired by license in the *Citizen Kane* screenplay were quite narrow, encompassing only motion picture and television rights, just as the producer in *Cohen* obtained the right to use the composer's music only in theaters and on television. Mercury, on the other hand, retained broad rights in the screenplay: publication, radio, and residual "other rights," just as the composer in *Cohen* retained "all rights" not granted to the producer. Had Mercury granted RKO sweeping rights in the screenplay and only retained minimal rights for itself, we might be able to distinguish *Cohen* and conclude that, had RKO and Mercury thought about the matter of home video rights, they would have vested those rights in RKO. But, in light of the narrow scope of

rights granted to RKO and the broad reservation of rights by Mercury, we cannot conclude with certainty that the parties would have given RKO home video rights had they contemplated the issue. We hold that the contract is ambiguous regarding which party owns the right to exploit the *Citizen Kane* screenplay on home video.[3]

Because we cannot discern, from the Production Agreement alone, what the parties in this case would have agreed upon had they known that some day *Citizen Kane* would be distributed on home video, we turn to extrinsic evidence to aid our interpretation of the contract. *See Hartford Accident & Indem. Co.*, 305 N.E.2d at 909.

[9] Beatrice Welles offers an expert declaration stating that

> [a]s of 1939, the term 'motion picture and television rights' was a term of art used in motion picture con-

---

[3]In so holding, we do not adopt a presumption against applying a grant of rights in "motion pictures" to new technologies. Instead, we simply interpret the written contract of the parties in this case, as our precedent instructs. *See Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 885 (9th Cir. 1996); *Cohen*, 845 F.2d at 854; *see also Boosey & Hawkes Music Publishers v. Walt Disney Co.*, 145 F.3d 481, 487 (2d Cir. 1998) (holding that "new-use analysis should rely on neutral principles of contract interpretation" and that "the language of the contract" governs). In some cases, a contract might permit the licensee to exploit the work in a new medium without a future technologies clause. For example, in *Maljack Productions*, we held that a licensee obtained the right to exploit certain music in a motion picture in a new medium when the license had no future technologies clause but granted the licensee "any and all worldwide rights under copyright and otherwise . . . to the music and musical composition recorded or contained upon the sound track of the Picture." 81 F.3d at 884-85 (alteration in original, internal quotation marks omitted). However, in this case, the Production Agreement, in addition to having no future technologies clause, granted RKO only motion picture and television rights in the *Citizen Kane* screenplay while granting Mercury broad, residual rights in the screenplay. It is thus not clear to us to whom the parties would have intended to grant the right to exploit the screenplay in new mediums.

tracts. At that time this term meant the exhibition of a motion picture in theatres and contemplated broadcast by television, although at that time television was not yet a viable commercial market. In 1939 the use of the term 'motion picture and television rights' did not include a grant of the right to make copies of a motion picture, embody such copies in home video devices, and to sell such copies to the public.

We cannot judge the credibility of this declaration on an appeal of summary judgment. *See Mallad Constr. Corp.*, 298 N.E.2d at 99. Because there is a genuine issue of fact about whether the parties intended the Production Agreement's grant of "motion picture and television rights" to RKO to allow RKO and its successors to distribute *Citizen Kane* on home video, and because the contract's interpretation may turn on the credibility of extrinsic evidence, we vacate the district court's summary judgment on Beatrice Welles's claim for a declaration of home video rights and remand for further proceedings.[4]

## IV

Beatrice Welles next argues that the Exit Agreement, which "cancelled and terminated" the Production Agreement, returned the *Citizen Kane* motion picture copyright to Mercury. In other words, Beatrice Welles argues that the Exit Agreement *rescinded* the Production Agreement.

[10] Before addressing the merits of this argument, we must first confront a choice-of-law issue raised by the parties.

---

[4]Beatrice Welles has requested that we take judicial notice of a certificate of recordation filed with the United States Copyright Office. The certificate indicates that Entertainment Acquisition Co. quitclaimed to Beatrice Welles any interest it had in the *Citizen Kane* screenplay. Because we remand this case to the district court to determine as a factual matter, who owns the right to exploit the *Citizen Kane* screenplay on home video, we DENY the request.

Unlike the Production Agreement, which contains a New York choice-of-law clause, the Exit Agreement has no choice-of-law provision. Beatrice Welles argues that we should apply New York law to interpret the Exit Agreement; the defendants encourage us to apply California law.

[11] As a federal court exercising diversity jurisdiction, we apply California's choice-of-law principles to determine the body of substantive law that applies to our interpretation of the Exit Agreement. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Absent an express choice of applicable law by the parties, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Cal. Civ. Code § 1646. When the contract does not expressly specify a place of performance, as is the case with the Exit Agreement, the place of performance is the jurisdiction in which the circumstances indicate the parties expected or intended the contract to be performed. *Burr v. W. States Life Ins. Co.*, 296 P. 273, 275 (Cal. 1931). The Exit Agreement concerned the rights in motion pictures made by Orson Welles and Mercury at RKO's studio in California. We apply California law.

[12] As noted above, the Exit Agreement stated that it was "the mutual desire of the parties to terminate and cancel" their prior agreements. Beatrice Welles argues that this language rescinded the parties' prior agreements and thus returned any right Orson Welles and Mercury had in the *Citizen Kane* motion picture to them. However, under California law, it seems that "terminate" and "cancel" mean something different from "rescind":

> The words 'terminate,' 'revoke' and 'cancel,' . . . all have the same meaning, namely, the abrogation of so much of the contract as might remain executory at the time notice is given, and must be sharply distin-

> guished from the word 'rescind,' . . . which conveys
> a retroactive effect, meaning to restore the parties to
> their former position.

*Grant v. Aerodraulics Co.*, 204 P.2d 683, 686 (Cal. Dist. Ct. App. 1949). Thus, under California law, the Exit Agreement prospectively terminated and cancelled Orson Welles's right to royalties, but did not retroactively rescind RKO's copyright in the *Citizen Kane* motion picture unless RKO's copyright remained executory at the time of the Exit Agreement.

Beatrice Welles points to language in the Exit Agreement providing that the parties "mutually release and discharge each party to each of said agreements from all rights, duties, liabilities and obligations thereunder." Beatrice Welles argues that, pursuant to this provision, RKO "released" its "right" to the *Citizen Kane* motion picture. Because Beatrice Welles does not offer any extrinsic evidence in support of her favored interpretation, the contract's interpretation is a question of law that can be decided by this court. *See LaCount v. Henzel Phelps Constr. Co.*, 79 Cal. App. 3d 754, 770 (Cal. Ct. App. 1978).

**[13]** As noted above, under California law, a termination or cancellation of a contract abrogates only executory rights held under the terminated and cancelled contract. In this case, RKO owned the *Citizen Kane* motion picture copyright as soon as the motion picture was created. The Production Agreement states that RKO "shall own the negative and positive prints of each of the Pictures and all rights of every kind and nature in and to each Picture . . . as soon as such rights come into existence." RKO, not Orson Welles or Mercury, initially registered the copyright to the *Citizen Kane* motion picture. Under the parties' agreements, RKO had always owned the motion picture copyright, and it had no executory right in the motion picture to release at the time the parties signed the Exit Agreement.

**[14]** As a further argument that the Exit Agreement retroactively rescinded the copyright RKO owned pursuant to the Production Agreement, Beatrice Welles cites cases holding that a second contract between the same parties "completely covering the same subject matter . . . so that the two [contracts] cannot stand together" rescinds the prior contract. *See Harrison W. Corp. v. United States*, 792 F.2d 1391, 1393 (9th Cir. 1986); *Housekeeper Publ'g Co. v. Swift*, 97 F. 290, 294 (8th Cir. 1899). However, that doctrine only applies when the two contracts seek the same performance on different terms and, hence, the contracts "cannot stand together." *See Harrison*, 792 F.2d at 1393 (holding that a second contract to complete an irrigation project rescinded the original contract to construct the project); *Housekeeper*, 97 F. at 294 (resolving conflict between "two contracts between the same parties for the sale of the same property"). Here, the two contracts are not in irreconcilable conflict. Rather, the second contract simply and explicitly cancels and terminates the first.

**[15]** The district court properly granted summary judgment to the defendants on the issue of ownership of the copyright to the *Citizen Kane* motion picture.

**V**

**[16]** Beatrice Welles also seeks an accounting for the compensation she alleges she is entitled to under the Actor Agreement signed by Orson Welles. The Actor Agreement provided Orson Welles compensation of $30,000 plus 20% of the net profits of *Citizen Kane*. In 1944, the parties signed the Exit Agreement, which noted that Orson Welles was not entitled to any contingent compensation and further stated the parties' desire to terminate and cancel all of their existing agreements, including the Actor Agreement. The parties do not dispute on appeal that this language from the Exit Agreement prospectively ended Orson Welles's right to contingent compensation under the Actor Agreement.

Beatrice Welles, however, argues that there is conflicting evidence about whether Orson Welles and RKO entered into another agreement, after the Exit Agreement, to share the profits of *Citizen Kane*. Beatrice Welles notes that, after 1944, RKO and Orson Welles jointly contracted to license the publication rights to the *Citizen Kane* screenplay to Bantam Books, Inc. Beatrice Welles also points out that, in 1989, the defendants licensed the stage rights to the *Citizen Kane* screenplay to Fifth Avenue Productions, Inc. Beatrice Welles argues that the defendants' right to license the *Citizen Kane* screenplay is evidence of a quid pro quo—that is, in exchange for the right to license the screenplay, Beatrice Welles urges us to infer that the defendants granted Orson Welles the right to share in the profits of *Citizen Kane* in some as-yet-unidentified agreement. Because this is a "justifiable inference[ ]," we make it on summary judgment. *Anderson*, 477 U.S. at 255. This inference is supported by the fact that Orson Welles's name appears on RKO's post-1944 schedules of persons who had royalty rights in *Citizen Kane*.

The defendants argue that the "hypothesized" existence of a post-1944 agreement is irrelevant because Beatrice Welles's second amended complaint only sought a declaration that she was entitled to profit participation under the Actor Agreement. However, the second amended complaint alleges that "the parties subsequently [i.e., after 1944] entered into a new agreement to share their rights and income." Beatrice Welles thus adequately pled her claim for an accounting.

[17] The defendants also point out that the post-1944 conduct of the parties indicates that Orson Welles had no profit interest in *Citizen Kane*. Specifically, the defendants point out that Orson Welles's attorneys had twice written RKO asking for an accounting of the profits generated by *Citizen Kane*, and RKO had twice told Orson Welles's attorneys that the Actor Agreement had been terminated. On the first occasion, Orson Welles's attorney responded by stating that he had overlooked the Exit Agreement and that his inquiry was

"completely answered," and, on the second occasion, Orson Welles's attorney did not respond. While this is evidence that Orson Welles had no profit interest in *Citizen Kane* at the time those letters were exchanged, it is not conclusive evidence that Orson Welles never had a post-1944 profit interest, and must be weighed by the trier of fact against all other relevant evidence in assessing whether there was a subsequent agreement to share the profits of *Citizen Kane*.

[18] We vacate the district court's summary judgment on Beatrice Welles's claim for profit participation and remand the claim for further proceedings. Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**