145 F.3d 481
 1998-1 Trade Cases P 72,142, 1998-1 Trade
Cases P 72,442,
1998 Copr.L.Dec. P 27,764, 46 U.S.P.Q.2d 1577
 BOOSEY & HAWKES MUSIC PUBLISHERS, LTD.,
Plaintiff-Appellee-Cross-Appellant,
v.
The WALT DISNEY COMPANY and Buena Vista Home Video,
Defendants-Appellants-Cross-Appellees.
 Nos. 34, 45, Dockets 96-9205, 96-9223.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 22, 1997.
Decided April 30, 1998.
 
 Marcia B. Paul, New York City (Toby M.J. Butterfield, Kay Collyer & Boose LLP, New York City, James M. Kendrick, Thacher Proffitt & Wood, New York City, of counsel), for Plaintiff-Appellee-Cross-Appellant.
 Eric J. Lobenfeld, New York City (Chadbourne & Parke LLP; Sanford M. Litvack and Edward J. Nowak, New York City, on the brief), for Defendants-Appellants-Cross-Appellees.
 Before: LEVAL and PARKER, Circuit Judges, and BAER, District Judge.*
 LEVAL, Circuit Judge:
 
 
 1
 Boosey & Hawkes Music Publishers Ltd., an English corporation and the assignee of Igor Stravinsky's copyrights for "The Rite of Spring," brought this action alleging that the Walt Disney Company's[1] foreign distribution in video cassette and laser disc format ("video format") of the film "Fantasia," featuring Stravinsky's work, infringed Boosey's rights. In 1939 Stravinsky licensed Disney's distribution of The Rite of Spring in the motion picture. Boosey, which acquired Stravinsky's copyright in 1947, contends that the license does not authorize distribution in video format.
 
 
 2
 The district court (Duffy, J.) granted partial summary judgment to Boosey, declaring that Disney's video format release was not authorized by the license agreement. Disney appeals from that ruling. The court granted partial summary judgment to Disney, dismissing Boosey's claims for breach of contract and violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); the court also dismissed Boosey's foreign copyright claims under the doctrine of forum non conveniens. Boosey appeals from these rulings.
 
 
 3
 We hold that summary judgment was properly granted to Disney with respect to Boosey's Lanham Act claims, but that material issues of fact barred the other grants of summary judgment. We also reverse the order dismissing for forum non conveniens.
 
 
 4
 Accordingly, we remand all but the Lanham Act claim for trial.
 
 I. BACKGROUND
 
 5
 During 1938, Disney sought Stravinsky's authorization to use The Rite of Spring (sometimes referred to as the "work" or the "composition") throughout the world in a motion picture. Because under United States law the work was in the public domain, Disney needed no authorization to record or distribute it in this country, but permission was required for distribution in countries where Stravinsky enjoyed copyright protection. In January 1939 the parties executed an agreement (the "1939 Agreement") giving Disney rights to use the work in a motion picture in consideration of a fee to Stravinsky of $6000.
 
 The 1939 Agreement provided that
 
 6
 In consideration of the sum of Six Thousand ($6,000.) Dollars, receipt of which is hereby acknowledged, [Stravinsky] does hereby give and grant unto Walt Disney Enterprises, a California corporation ... the nonexclusive, irrevocable right, license, privilege and authority to record in any manner, medium or form, and to license the performance of, the musical composition hereinbelow set out ...
 
 
 7
 Under "type of use" in p 3, the Agreement specified that
 
 
 8
 The music of said musical composition may be used in one motion picture throughout the length thereof or through such portion or portions thereof as the Purchaser shall desire. The said music may be used in whole or in part and may be adapted, changed, added to or subtracted from, all as shall appear desirable to the Purchaser in its uncontrolled discretion.... The title "Rites of Spring" or "Le Sacre de Printemps", or any other title, may be used as the title of said motion picture and the name of [Stravinsky] may be announced in or in connection with said motion picture.
 
 
 9
 The Agreement went on to specify in p 4 that Disney's license to the work "is limited to the use of the musical composition in synchronism or timed-relation with the motion picture."
 
 
 10
 Paragraph Five of the Agreement provided that
 
 
 11
 The right to record the musical composition as covered by this agreement is conditioned upon the performance of the musical work in theatres having valid licenses from the American Society of Composers, Authors and Publishers, or any other performing rights society having jurisdiction in the territory in which the said musical composition is performed.
 
 
 12
 We refer to this clause, which is of importance to the litigation, as "the ASCAP Condition."
 
 
 13
 Finally, p 7 of the Agreement provided that "the licensor reserves to himself all rights and uses in and to the said musical composition not herein specifically granted" (the "reservation clause").
 
 
 14
 Disney released Fantasia, starring Mickey Mouse, in 1940. The film contains no dialogue. It matches a pantomime of animated beasts and fantastic creatures to passages of great classical music, creating what critics celebrated as a "partnership between fine music and animated film." The soundtrack uses compositions of Bach, Beethoven, Dukas, Schubert, Tchaikovsky, and Stravinsky, all performed by the Philadelphia Orchestra under the direction of Leopold Stokowski. As it appears in the film soundtrack, The Rite of Spring was shortened from its original 34 minutes to about 22.5; sections of the score were cut, while other sections were reordered. For more than five decades Disney exhibited The Rite of Spring in Fantasia under the 1939 license. The film has been re-released for theatrical distribution at least seven times since 1940, and although Fantasia has never appeared on television in its entirety, excerpts including portions of The Rite of Spring have been televised occasionally over the years. Neither Stravinsky nor Boosey has ever previously objected to any of the distributions.
 
 
 15
 In 1991 Disney first released Fantasia in video format. The video has been sold in foreign countries, as well as in the United States. To date, the Fantasia video release has generated more than $360 million in gross revenue for Disney.
 
 
 16
 Boosey brought this action in February 1993. The complaint sought (1) a declaration that the 1939 Agreement did not include a grant of rights to Disney to use the Stravinsky work in video format; (2) damages for copyright infringement in at least 18 foreign countries; (3) damages under the Lanham Act for false designation of origin and misrepresentation by reason of Disney's alteration of Stravinsky's work; (4) damages for breach of contract, alleging that the video format release breached the 1939 Agreement; and (5) damages for unjust enrichment.[2]
 
 
 17
 On cross-motions for summary judgment the district court made the rulings described above. In determining that the license did not cover the distribution of a video format, the district court found that while the broad language of the license gave Disney "the right to record [the work] on video tape and laser disc," the ASCAP Condition "prevents Disney from distributing video tapes or laser discs directly to consumers." Boosey & Hawkes Music Publishers Ltd. v. Walt Disney Co., 934 F.Supp. 119, 123 (S.D.N.Y.1996). The court therefore concluded that Disney's video format sales exceeded the scope of the license.
 
 
 18
 However, as noted, the district court invoked forum non conveniens to dismiss all of Boosey's claims of copyright infringement because they involved the application of foreign law. See id. at 124-25. The court dismissed Boosey's claim for damages under the Lanham Act because of plaintiff's failure to introduce evidence of actual consumer confusion, see id. at 126, and dismissed Boosey's breach of contract claim, finding that Disney had discharged its only contracted obligation, which was to pay Stravinsky $6000. See id. at 126-27.
 
 
 19
 The decision below thus declared Disney an infringer, but granted Boosey no relief, leaving it to sue in the various countries under whose copyright laws it claims infringement. Id. at 125. This appeal followed.
 
 II. DISCUSSION
 
 20
 We confront four questions on appeal. Disney challenges the summary judgment which declared that the 1939 Agreement does not authorize video distribution of The Rite of Spring. Boosey appeals three other rulings: the dismissal for forum non conveniens, and the grants of summary judgment on the claims for damages for violation of the Lanham Act and breach of contract.
 
 
 21
 A. Declaratory Judgment on the Scope of the License.
 
 
 22
 Boosey's request for declaratory judgment raises two issues of contract interpretation: whether the general grant of permission under the 1939 Agreement licensed Disney to use The Rite of Spring in the video format version of Fantasia (on which the district court found in Disney's favor); and, if so, whether the ASCAP Condition barred Disney from exploiting the work through video format (on which the district court found for Boosey).
 
 
 23
 1. Whether the "motion picture" license covers video format. Boosey contends that the license to use Stravinsky's work in a "motion picture" did not authorize distribution of the motion picture in video format, especially in view of the absence of an express provision for "future technologies" and Stravinsky's reservation of all rights not granted in the Agreement. Disputes about whether licensees may exploit licensed works through new marketing channels made possible by technologies developed after the licensing contract--often called "new-use" problems--have vexed courts since at least the advent of the motion picture. See 3 Melville B. Nimmer and David Nimmer, Nimmer on Copyright, § 10.10[A] at 10-86 (hereinafter "Nimmer"); Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163 (1933) (deciding whether a license for a stage production also conveyed rights in sound motion pictures).
 
 
 24
 In Bartsch v. Metro-Goldwyn-Mayer, Inc., we held that "licensee[s] may properly pursue any uses which may reasonably be said to fall within the medium as described in the license." 391 F.2d 150, 155 (2d Cir.1968) (Friendly, J.) (quoting Nimmer). We held in Bartsch that a license of motion picture rights to a play included the right to telecast the motion picture. We observed that "[i]f the words are broad enough to cover the new use, it seems fairer that the burden of framing and negotiating an exception should fall on the grantor," at least when the new medium is not completely unknown at the time of contracting. Id. at 154, 155.
 
 
 25
 The 1939 Agreement conveys the right "to record [the composition] in any manner, medium or form" for use "in [a] motion picture." We believe this language is broad enough to include distribution of the motion picture in video format. At a minimum, Bartsch holds that when a license includes a grant of rights that is reasonably read to cover a new use (at least where the new use was foreseeable at the time of contracting), the burden of excluding the right to the new use will rest on the grantor. 391 F.2d at 155; see also Bloom v. Hearst Entertainment Inc., 33 F.3d 518, 524-25 (5th Cir.1994) (applying Bartsch to hold that a grant of movie and television rights to a book encompassed video rights as well). The license "to record in any manner, medium or form" doubtless extends to videocassette recording and we can see no reason why the grant of "motion picture" reproduction rights should not include the video format, absent any indication in the Agreement to the contrary. See Bourne v. Walt Disney Co., 68 F.3d 621, 630 (2d Cir.1995); Bloom, 33 F.3d at 525. If a new-use license hinges on the foreseeability of the new channels of distribution at the time of contracting--a question left open in Bartsch--Disney has proffered unrefuted evidence that a nascent market for home viewing of feature films existed by 1939. The Bartsch analysis thus compels the conclusion that the license for motion picture rights extends to video format distribution.
 
 
 26
 We recognize that courts and scholars are not in complete accord on the capacity of a broad license to cover future developed markets resulting from new technologies. The Nimmer treatise describes two principal approaches to the problem. According to the first view, advocated here by Boosey, "a license of rights in a given medium (e.g., 'motion picture rights') includes only such uses as fall within the unambiguous core meaning of the term (e.g., exhibition of motion picture film in motion picture theaters) and exclude any uses that lie within the ambiguous penumbra (e.g., exhibition of motion picture on television)." Nimmer, § 10.10[B] at 10-90; see also Cohen v. Paramount Pictures Corp., 845 F.2d 851, 853-54 (9th Cir.1988) (holding that license to use musical score in television production does not extend to use in videocassette release); Rey v. Lafferty, 990 F.2d 1379, 1390-91 (1st Cir.1993) (holding that license to portray Curious George in animations for "television viewing" does not extend to videocassette release). Under this approach, a license given in 1939 to "motion picture" rights would include only the core uses of "motion picture" as understood in 1939--presumably theatrical distribution--and would not include subsequently developed methods of distribution of a motion picture such as television videocassettes or laser discs. See Nimmer § 10.10[b] at 10-90.
 
 
 27
 The second position described by Nimmer is "that the licensee may properly pursue any uses that may reasonably be said to fall within the medium as described in the license." Id. at 10-91. Nimmer expresses clear preferences for the latter approach on the ground that it is "less likely to prove unjust." Id. As Judge Friendly noted in Bartsch, "[S]o do we." 391 F.2d at 155.
 
 
 28
 We acknowledge that a result which deprives the author-licensor of participation in the profits of new unforeseen channels of distribution is not an altogether happy solution. Nonetheless, we think it more fair and sensible than a result that would deprive a contracting party of the rights reasonably found in the terms of the contract it negotiates. This issue is too often, and improperly, framed as one of favoritism as between licensors and licensees. Because licensors are often authors--whose creativity the copyright laws intend to nurture--and are often impecunious, while licensees are often large business organizations, there is sometimes a tendency in copyright scholarship and adjudication to seek solutions that favor licensors over licensees. Thus in Cohen, 845 F.2d at 854, the Ninth Circuit wrote that a "license must be construed in accordance with the purpose underlying federal copyright law," which the court construed as the granting of valuable, enforceable rights to authors and the encouragement of the production of literary works. Asserting that copyright law "is enacted for the benefit of the composer," (quoting Jondora Music Publish. Co. v. Melody Recordings, Inc., 506 F.2d 392, 395 (3rd Cir.1974) (as amended)), the court concluded that it would "frustrate the purposes of the [copyright] Act" to construe the license as encompassing video technology, which did not exist when the license was granted. Id.; see also Warner Bros. Pictures v. Columbia Broadcasting System, 216 F.2d 945, 949 (9th Cir.1954) ("Such doubt as there is should be resolved in favor of the composer. The clearest language is necessary to divest the author from the fruit of his labor."); William F. Patry, 1 Copyright Law and Practice 392 (1994) (arguing that "agreements should, wherever possible, be construed in favor of the copyright transferor," to reflect Congress's "policy judgment that copyright owners should retain all rights unless specifically transferred").
 
 
 29
 In our view, new-use analysis should rely on neutral principles of contract interpretation rather than solicitude for either party. Although Bartsch speaks of placing the "burden of framing and negotiating an exception ... on the grantor," 391 F.2d at 155, it should not be understood to adopt a default rule in favor of copyright licensees or any default rule whatsoever.[3] What governs under Bartsch is the language of the contract. If the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation. This principle favors neither licensors nor licensees. It follows simply from the words of the contract.
 
 
 30
 The words of Disney's license are more reasonably read to include than to exclude a motion picture distributed in video format. Thus, we conclude that the burden fell on Stravinsky, if he wished to exclude new markets arising from subsequently developed motion picture technology, to insert such language of limitation in the license, rather than on Disney to add language that reiterated what the license already stated.
 
 
 31
 Other significant jurisprudential and policy considerations confirm our approach to new-use problems. We think that our view is more consistent with the law of contract than the view that would exclude new technologies even when they reasonably fall within the description of what is licensed. Although contract interpretation normally requires inquiry into the intent of the contracting parties, intent is not likely to be helpful when the subject of the inquiry is something the parties were not thinking about. See Nimmer, § 10.10[B] at 10-90 (noting that usually "there simply was no intent at all at the time of execution with respect to ... whether the grant includes a new use developed at a later time"). Nor is extrinsic evidence such as past dealings or industry custom likely to illuminate the intent of the parties, because the use in question was, by hypothesis, new, and could not have been the subject of prior negotiations or established practice. See Michael R. Fuller, Hollywood Goes Interactive: Licensing Problems Associated with Re-Purposing Motion Pictures into Interactive Multimedia Videogames, 15 Loy. L.A. Ent. L.J. 599, 607 (1985). Moreover, many years after formation of the contract, it may well be impossible to consult the principals or retreive documentary evidence to ascertain the parties' intent, if any, with respect to new uses. On the other hand, the parties or assignees of the contract should be entitled to rely on the words of the contract. Especially where, as here, evidence probative of intent is likely to be both scant and unreliable, the burden of justifying a departure from the most reasonable reading of the contract should fall on the party advocating the departure.[4]
 
 
 32
 Neither the absence of a future technologies clause in the Agreement nor the presence of the reservation clause alters that analysis. The reservation clause stands for no more than the truism that Stravinsky retained whatever he had not granted. It contributes nothing to the definition of the boundaries of the license. See Bartsch, 391 F.2d at 154 n. 1. And irrespective of the presence or absence of a clause expressly confirming a license over future technologies, the burden still falls on the party advancing a deviation from the most reasonable reading of the license to insure that the desired deviation is reflected in the final terms of the contract. As we have already stated, if the broad terms of the license are more reasonably read to include the particular future technology in question, then the licensee may rely on that language.
 
 
 33
 Bartsch therefore continues to articulate our "preferred" approach to new-use questions, Nimmer, § 10.10[B] at 10-91, and we hold that the district court properly applied it to find that the basic terms of Disney's license included the right to record and distribute Fantasia in video format.
 
 
 34
 2. The ASCAP Condition. Boosey further contends that distribution of Fantasia in video format violated the ASCAP Condition. The district court agreed. It granted summary judgment to Boosey declaring that the ASCAP Condition "prevents Disney from distributing video tapes and laser discs directly to consumers." Boosey & Hawkes, 934 F.Supp. at 123. We disagree with the district court's analysis.
 
 The ASCAP Condition provides that
 
 35
 The right to record the musical composition as covered by this agreement is conditioned upon the performance of the musical work in theaters having valid licenses from the American Society of Composers, Authors and Publishers, or any other performing rights society having jurisdiction in the territory in which the said musical composition is performed.
 
 
 36
 The court apparently believed, as Boosey argues, that the ASCAP Condition unambiguously limited Disney's exploitation of its motion picture to theaters operating under a license from ASCAP or similar performing rights society. This interpretation treats the clause as if it stated explicitly either that the license extends only to performances in theaters licensed by ASCAP, or that Disney commits itself to exploit the license only in such theaters. But that is not what the clause says.
 
 
 37
 The terms of the provision condition Disney's right to record the work only "upon the performance of the ... work in theaters" having ASCAP (or similar) licenses. Read literally, this language requires no more of Disney than that it expose the motion picture in two or more ASCAP-certified theaters, a condition surely long ago satisfied. Whatever may have been the intention, the ASCAP Condition does not unambiguously prohibit Disney from exhibiting the composition in non-ASCAP theaters, or from distributing the film directly to consumers.
 
 
 38
 Apart from the fact that the language of the Condition does not compel Boosey's interpretation, there is also good reason to regard that construction as improbable. Because the work was in the public domain in the United States, the license pertained only to foreign rights, which the contract described as world wide. Construing the Condition as Boosey argues would mean that the film could not be shown at all in any country where the work was protected and theaters did not employ ASCAP-type licenses.
 
 
 39
 Furthermore, we learn from a leading treatise on music licensing that this very clause was industry boilerplate that appeared in "countless synchronization licenses" for U.S. films. Al Kohn & Bob Kohn, Kohn on Music Licensing, 838-40, 857-58 (2d ed.1996). If the clause meant what Boosey contends, studios whose films included copyrighted works licensed with this boilerplate provision would be completely prohibited from showing their films at all in the United States in the event that U.S. movie theaters ceased to employ ASCAP licenses. It seems highly unlikely that the film industry entered into contracts that would place it at the mercy of its licensors, in the event that ASCAP licensing was for whatever reason abandoned.
 
 
 40
 Indeed, ASCAP licenses did disappear from U.S. theaters as a result of an antitrust ruling in 1948. See Alden-Rochelle, Inc. v. ASCAP, 80 F.Supp. 888, 894-96 (S.D.N.Y.1948). Under Boosey's reading, "countless" movies containing copyrighted works licensed with the ASCAP Condition were thereafter barred from U.S. theatrical release. If Boosey's interpretation of the Condition was widely shared, frequent litigation to sort out the rights of licensors and licensees after the demise of ASCAP theater licensing would have been inevitable. That Boosey has not cited a single court decision confirming its view of the ASCAP Condition strongly suggests that its view of the provision was not, in fact, widely held.[5]
 
 
 41
 Kohn appears to indicate, moreover, that the ASCAP Condition remained industry boilerplate until sometime in the 1950s. Kohn, supra, at 840. If this is true, Boosey's view of the Condition requires us to believe that studios agreed to limit distribution of movies containing licensed works to ASCAP-licensed theaters even after ASCAP licensing of theaters had been declared unlawful. Not only would it would be nonsensical for moviemakers to predicate their license to copyrighted works on a condition that could not lawfully be satisfied, but it is unimaginable that they would produce films whose distribution to the domestic market hinged on subsequent permission, or quiescence, of licensors.
 
 
 42
 We find that neither party's interpretation is compelled by the plain terms of the provision. Accord Kohn, supra, at 838-39 (classifying a hypothetical provision identical to the ASCAP Condition as a license whose scope is unclear). The Condition is sufficiently unclear on its face to justify consideration of extrinsic evidence. See Shann v. Dunk, 84 F.3d 73, 80 (2d Cir.1996).
 
 
 43
 Boosey argues that any ambiguity regarding the meaning of the ASCAP Provision is dissipated by extrinsic evidence showing Disney knew that the 1939 Agreement permitted use of the composition only in ASCAP-licensed motion picture theaters.[6] We do not find this evidence persuasive.
 
 
 44
 Boosey first points to the parties' limited post-contract course of dealing. In 1941, Boosey notes, Disney acknowledged that the Agreement did not license use of The Rite of Spring on radio. In 1969, Disney negotiated and paid for the right to release the soundtrack recording of "The Rite of Spring" as part of a complete Fantasia album. And in 1990, Disney unsuccessfully sought Boosey's permission to use sections of the composition "in a new performance by ... Pink Floyd to be filmed at the Great Pyramid of Giza, while imagery from 'Fantasia' is projected across the entire face of the Pyramid." Boosey would have us infer that these requests for permission demonstrate Disney's awareness that its right to the composition was limited to exploitation in licensed motion picture theaters.
 
 
 45
 However, those exploitations of the composition seem clearly beyond the scope of the 1939 Agreement. None of the proposed uses involved "the use of the musical composition in synchronism or timed-relation" with Fantasia, as required by p 4 of the Agreement;[7] the 1941 and 1969 requests did not even envision use of the composition in a motion picture, as required by p 3 of the Agreement. Because the Agreement could not reasonably be interpreted to cover these uses, Disney's decision to seek supplemental permission for them reveals nothing regarding its view as to whether it was authorized to license Fantasia otherwise than in theaters with ASCAP licenses.
 
 
 46
 Indeed, there is course of dealing evidence that supports the opposite conclusion--that Disney did not view the license as restricted to performance in ASCAP-licensed theaters. Without seeking Boosey's permission, Disney appears to have sold Fantasia directly to consumers in at least two foreign markets and telecast the composition in excerpts from "Fantasia" several times. That Disney sought permission for uses of the composition not involving the motion picture Fantasia, but did not seek permission for direct distribution of Fantasia in alternative motion picture formats, arguably rebuts Boosey's argument that Disney's conduct shows it agreed with Boosey's interpretation.
 
 
 47
 Boosey's other extrinsic evidence is no more compelling. Boosey points out that in contracts for other compositions used in Fantasia, negotiated at about the same time as the 1939 Agreement, it was Disney's "right to license the performance" that was conditioned on ASCAP performance (emphasis added). In Stravinsky's contract it was the right "to record" that was so conditioned. Because a condition on the "right to record" is more drastic than a limitation on the right to license, Boosey argues that Stravinsky bargained for an enhanced interest in Fantasia's continuing revenue stream.
 
 
 48
 We find the argument unpersuasive. Even if Disney did agree to a more drastic restriction resulting from its failure to comply with the ASCAP Condition, that sheds no light on what conduct was needed to satisfy the Condition. Furthermore, Boosey's point is illusory. Because The Rite of Spring was in the public domain in the United States--where Disney was making its motion picture--Disney did not need a license from Stravinsky "to record" the composition. It needed Stravinsky's permission only to license performances in countries where Stravinsky's copyright interest was recognized. As a practical matter, therefore, Disney did not place more at stake in agreeing to a condition on its right "to record" than in other contracts where the condition applied to its right "to license." Indeed, it is arguable that because the condition applied only to something Disney had the right to do without Stravinsky's permission, the ASCAP Condition had no functional significance at all.
 
 
 49
 Neither the plain terms of the 1939 Agreement nor the sparse and contradictory extrinsic evidence require the conclusion that Disney's license is limited to theatrical performance of the composition. Summary judgment is therefore inappropriate. We vacate the summary grant of declaratory judgment in Boosey's favor and remand for a trial to determine whether Disney's video format release violated the ASCAP Condition.
 
 
 50
 B. Foreign Copyright Claims.
 
 
 51
 Invoking the doctrine of forum non conveniens, the district court dismissed Boosey's second cause of action, which sought damages for copyright infringement deriving from Disney's sales of videocassettes of Fantasia in at least eighteen foreign countries. Boosey & Hawkes, 934 F.Supp. at 125. The court below concluded that these claims should be tried "in each of the nations whose copyright laws are invoked." Id. at 124. Boosey appeals, seeking remand to the district court for trial.
 
 
 52
 District courts enjoy broad discretion to decide whether to dismiss an action under the doctrine of forum non conveniens. See Scottish Air Int'l Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1232 (2d Cir.1996). Nevertheless, this discretion is subject to "meaningful appellate review." R. Maganlal & Co. v. M.G. Chem. Co., Inc., 942 F.2d 164, 167 (2d Cir.1991). A dismissal for forum non conveniens will be upset on appeal where a defendant has failed to demonstrate that "an adequate alternative forum exists" and that "the balance of convenience tilts strongly in favor of trial in the foreign forum." Id.; see also Manu Int'l S.A. v. Avon Products Inc., 641 F.2d 62, 65 (2d Cir.1981) (emphasizing appellate obligation to enforce principle that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed") (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)).
 
 
 53
 We recently explained that a motion to dismiss under forum non conveniens is decided in two steps. See Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir.1996). The district court first must determine whether there exists an alternative forum with jurisdiction to hear the case. Id. If so, the court then weighs the factors set out in Gilbert, 330 U.S at 508-09, 67 S.Ct. at 843 ("the Gilbert factors"), to decide which "forum ... will be most convenient and will best serve the ends of justice." Peregrine Myanmar, 89 F.3d at 46.
 
 
 54
 The district court failed to consider whether there were alternative fora capable of adjudicating Boosey's copyright claims. Boosey & Hawkes, 934 F.Supp. at 125. It made no determination whether Disney was subject to jurisdiction in the various countries where the court anticipated that trial would occur and did not condition dismissal on Disney's consent to jurisdiction in those nations.[8]
 
 
 55
 Furthermore, consideration of the Gilbert factors makes plain that forum non conveniens is inappropriate here. The district court must carefully weigh the private and public interests set forth in Gilbert and may grant the forum non conveniens motion only if these considerations strongly support dismissal. See R. Maganlal & Co., 942 F.2d at 167-68; see also Manu Int'l, 641 F.2d at 65, 67 (indicating that presumption in favor of plaintiff's choice of forum also applies to foreign litigants). Relevant private interests of the litigants include access to proof, availability of witnesses and "all other practical problems that make trial of a case easy, expeditious and inexpensive." Gilbert, 330 U.S. at 508, 67 S.Ct. at 843.
 
 
 56
 The private interests of the litigants favor conducting the litigation in New York where the plaintiff brought suit. Disney does not allege that a New York forum is inconvenient. The necessary evidence and witnesses are available and ready for presentation. A trial here promises to begin and end sooner than elsewhere, and would allow the parties to sort out their rights and obligations in a single proceeding. This is not a circumstance where the plaintiff's choice of forum is motivated by harassment. Gilbert, 330 U.S. at 507, 67 S.Ct. at 842. Indeed, it seems rather more likely that Disney's motion seeks to split the suit into 18 parts in 18 nations, complicate the suit, delay it, and render it more expensive.
 
 
 57
 In dismissing the cases, the court relied on the "public interests" identified in Gilbert. It reasoned that the trial would require extensive application of foreign copyright and antitrust jurisprudence, bodies of law involving strong national interests best litigated "in their respective countries." Boosey & Hawkes, 934 F.Supp. at 124. The court concluded as well that these necessary inquiries into foreign law would place "an undue burden on our judicial system." Id.
 
 
 58
 While reluctance to apply foreign law is a valid factor favoring dismissal under Gilbert, standing alone it does not justify dismissal. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 260 n. 29, 102 S.Ct. 252, 268 n. 29, 70 L.Ed.2d 419 (1981) ("[T]he need to apply foreign law .... alone is not sufficient to warrant dismissal."). District courts must weigh this factor along with the other relevant considerations. See id.; see also Manu Int'l, 641 F.2d at 68 ("Proof of foreign law ... is not alone enough to push the balance of convenience strongly in favor of the defendant. The other forum non conveniens factors must do that."). Numerous countervailing considerations suggest that New York venue is proper: defendant is a U.S. corporation, the 1939 agreement was substantially negotiated and signed in New York, and the agreement is governed by New York law. The plaintiff has chosen New York and the trial is ready to proceed here. Everything before us suggests that trial would be more "easy, expeditious and inexpensive" in the district court than dispersed to 18 foreign nations. See Gilbert, 330 U.S. at 508, 67 S.Ct. at 843; R. Maganlal & Co., 942 F.2d at 167. We therefore vacate the dismissal of the foreign copyright claims and remand for trial.
 
 
 59
 C. Breach of Contract.
 
 
 60
 Boosey also seeks relief for breach of contract. Boosey alleged that Disney's foreign release of Fantasia in video format breached the 1939 Agreement. The complaint sought rescission of Disney's license and damages.
 
 
 61
 Boosey moved for partial summary judgment declaring that Disney's foreign marketing of the video breached the Agreement. Instead, the district court sua sponte granted summary judgment on this claim in favor of Disney. It ruled that the Agreement imposed no obligations on Disney other than the payment of $6000 to Stravinsky, which Disney had done. The court accordingly concluded the "Disney cannot be said to have breached the agreement." Boosey and Hawkes, 934 F.Supp. at 127.
 
 
 62
 We disagree. As we explained above, the so-called ASCAP Condition of the contract is facially unclear. We cannot preclude as a matter of law the possibility that parol evidence would show a contractual undertaking by Disney not to perform (or license performance of) Fantasia otherwise than in theaters with ASCAP-like licenses. If this were found to be the meaning of the ASCAP Condition, we see no reason why Boosey would not be entitled to contract remedies for the breach of contract resulting from Disney's breach of that promise through its video marketing.
 
 
 63
 Accordingly we vacate the grant of summary judgment to Disney on the contract claim.
 
 
 64
 D. Lanham Act Claim.
 
 
 65
 We affirm the district court's grant of summary judgment dismissing Boosey's claim for damages under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[9] The gravamen of the claim is that Disney misleadingly represented that Fantasia contained a "full and accurate" recording of the Rite of Spring, whereas in fact the Fantasia version of the composition is shortened and edited.
 
 
 66
 Our case law "is well settled that in order for a Lanham Act plaintiff to receive an award of damages the plaintiff must prove either actual consumer confusion or deception resulting from the violation, ... or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion." George Basch Co. v. Blue Coral Inc., 968 F.2d 1532, 1537 (2d Cir.1992)(initial quotation marks omitted); see also Resource Developers Inc. v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 140 (2d Cir.1991).
 
 
 67
 Boosey admits that it proffered no proof of actual confusion. Nor has it submitted evidence that would raise an issue of material fact as to intentional deception. See Resource Developers, 926 F.2d at 140.[10] Indeed, such an allegation of public deception would be untenable given the facts of this dispute. With Stravinsky's express authorization under p 3 of the 1939 Agreement, Disney has represented to the public in countless theatrical performances that the composition as it appears in Fantasia is Stravinsky's The Rite of Spring. No deception arises simply because the same composition appears in a video format release of the same film. In this sense, the deception claim may said to have been waived.
 
 Conclusion
 
 68
 The grants of summary judgment in Boosey's favor declaring that Disney's foreign video format marketing exceeded the terms of the license, and in Disney's favor dismissing Boosey's claim for breach of contract are vacated. The dismissal of the action by reason of forum non conveniens is reversed. The dismissal of Boosey's claim under the Lanham Act is affirmed.
 
 
 
 *
 The Honorable Harold Baer, Jr., United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Buena Vista Home Video, a Disney affiliate, was also named as a defendant. The two defendants are collectively referred to as "Disney."
 
 
 [2]
 Boosey abandoned its cause of action sounding in unjust enrichment as preempted by the Copyright Act early in the litigation. The issue was not presented on this appeal
 
 
 [3]
 We note that commentators and courts have misinterpreted Bartsch in just this way. See, e.g., Filmvideo Releasing Corp. v. Hastings, 426 F.Supp. 690, 695 (S.D.N.Y.1976) (interpreting Bartsch to mean that "the words of the grant are to be construed against the grantor"); James W. Dabney, Licenses and New Technology: Apportioning and Benefits, C674 ALI-ABA 85, 89, 96 (characterizing Bartsch as a "pro-licensee" decision that articulates a rule of contract construction favoring licensees in new-use cases). We emphasize that Bartsch favors neither party and announces no special rule of contract interpretation for the new-use context. Rather, it instructs courts to rely on the language of the license contract and basic principles of interpretation
 
 
 [4]
 We note also that an approach to new-use problems that tilts against licensees gives rise to antiprogressive incentives. Motion picture producers would be reluctant to explore and utilize innovative technologies for the exhibition of movies if the consequence would be that they would lose the right to exhibit pictures containing licensed works. See Bartsch, 391 F.2d at 155
 Nor do we believe that our approach disadvantages licensors. By holding contracting parties accountable to the reasonable interpretation of their agreements, we encourage licensors and licensees to anticipate and bargain for the full value of potential future uses. Licensors reluctant to anticipate future developments remain free to negotiate language that clearly reserves the rights to future uses. But the creation of exceptional principles of contract construction that places doubt on the capacity of a license to transfer new technologies is likely to harm licensors together with licensees, by placing a significant percentage of the profits they might have shared in the hands of lawyers instead.
 
 
 [5]
 Boosey contends, in its petition for rehearing, that there are answers to the question we raise. These questions only confirm our view that summary judgment should not have been granted on this issue. Our discussion does not preclude any factual issues which may be raised at trial
 
 
 [6]
 As there are no known surviving witnesses to the negotiation of the 1939 Agreement, the only extrinsic evidence is documentary
 
 
 [7]
 Boosey contends in its petition for rehearing that the proposed Pink Floyd performance would have involved the use of Stravinsky's composition "in synchronism" with the motion picture. If so, and the issue is relevant, Boosey will be free to demonstrate this at trial. Our discussion is intended to show that summary judgment should not have been granted regarding the ASCAP condition, and not to foreclose from trial any disputed issues of material fact
 
 
 [8]
 We need not decide, therefore, whether forum non conveniens dismissal requires the dismissing court to ascertain a single alternative court with jurisdiction over the claims, because, at a minimum, our jurisprudence requires a pre-dismissal determination that the claims be justiciable somewhere. See Peregrine Myanmar, 89 F.3d at 45; cf. Overseas Programming Companies, Ltd. v. Cinematographische Commerz-Anstalt, 684 F.2d 232, 234-35 (2d Cir.1982) ("[T]he District Court erred in failing to designate a more convenient forum to which the parties should be relegated.")
 
 
 [9]
 Section 43(a) of the Lanham Act provides that
 (1) Any person who, on or in connection with any goods or services ..., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
 (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
 (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities,
 shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 15 U.S.C. § 1125(a).
 
 
 [10]
 We also pose the question whether Stravinsky's assignment of his copyright to Boosey gave Boosey entitlement to assert Stravinsky's claim for violation of the Lanham Act